[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 23, 2010
JOHN LEY
CLERK

_____

No. 08-11245

_____

D. C. Docket No. 07-00478-CV-CG

KEIDRICK C. WOOTEN,
MITZI D. WOOTEN,
BILLY R. BUCKHAULTS,
CHERYL A. BUCKHAULTS,
on behalf of themselves and
all others similarly situated,

                                          Plaintiffs-Appellants,

versus

QUICKEN LOANS, INC.,

                                          Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(November 23, 2010)

Before TJOFLAT and EDMONDSON, Circuit Judges, and RYSKAMP,[*] District Judge.

TJOFLAT, Circuit Judge:

Section 8(b) of the Real Estate Settlement Procedures Act ("RESPA") provides:

> (b) Splitting charges.  No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(b).  The principal question this appeal presents is whether, in connection with a residential mortgage loan, charging a loan discount payment—otherwise known as "points" or "discount points"—to provide a specific, below-market interest rate constitutes the "rendering of a real estate settlement service" within the meaning of § 2607(b).  The district court, dismissing the appellant borrowers' complaint for failure to state a violation of § 2607(b), held that the borrowers' payment of such points was not for the "rendering of a real estate settlement service."  We agree, and therefore affirm the court's ruling.

I.

This is a class action brought against Quicken Loans, Inc. ("Quicken") by

---

[*]Honorable Kenneth L. Ryskamp, United States District Judge, Southern District of Florida, sitting by designation.

two sets of borrowers: Keidrick C. Wooten and Mitzi D. Wooten, his wife, and Billy R. Buckhaults and Cheryl A. Buckhaults, his wife.[1]  These plaintiffs purportedly represent everyone who obtained a residential mortgage loan from Quicken and was charged points, but did not receive the specific, below-market interest rate Quicken promised.  The Wootens' and Buckhaults' transactions differed; thus, we set them out separately.

Before doing so, however, we should point out that plaintiffs' counsel, in drafting the complaint in this case, failed to attach to the complaint the notes and mortgages the Wootens and Buckhaults executed.  Defense counsel attached the notes to Quicken's motion to dismiss the complaint, and the district court, over plaintiffs' objection, made the instruments part of the complaint,[2] relying on them in granting Quicken's motion.  The complaint also alleges that Quicken furnished the respective borrowers the mortgage-closing statement required by the U.S. Department of Housing and Urban Development, "Settlement Statement (HUD-1)" ("HUD-1"), and that the HUD-1, on line 802, indicated that Quicken was charging the borrowers a "Loan Discount" percentage, or points, for the specific interest rate

_____

[1]  Quicken is a Michigan corporation with its principal place of business in Michigan. The Wootens and Buckhaults are Alabama residents.  They invoked the district court's federal question jurisdiction, 28 U.S.C. § 1331, to prosecute their RESPA claims, and the court's supplemental jurisdiction, 28 U.S.C. § 1367, to prosecute their state law claims for breach of contract.

[2]  Plaintiffs do not challenge the court's ruling in this appeal.

3

stated in the mortgage note. As was the case with respect to the notes and mortgages, the HUD-1s presented to the borrowers were not part of the complaint. Nor were they attached to Quicken's motion to dismiss, or referred to by the district court in its dispositive order. To the end that the facts surrounding the loan closings may be presented in full, we consider as part of the complaint both the HUD-1s the borrowers received and, as the district court did, the notes they executed.[3]

### A.

On July 18, 2006, the Wootens entered into a residential mortgage transaction with Quicken. They executed an "Adjustable Rate Note" for $132,250, payable in 30 years, at an "initial fixed interest rate" of 5.875% per annum.[4] "Quicken charged the Wootens a loan discount fee of $5,951.00, an amount equal to 4.5% of their loan amount. The Wootens did not negotiate for a buy-down of the interest rate nor did they receive a lower interest rate in return for paying

---

[3] We take judicial notice of the HUD-1s in effect when the loans closed. The 2006 HUD-1 can be found at 24 C.F.R. Pt. 3500 App. A (2006), available at http://edocket.access.gpo.gov/cfr_2006/aprqtr/pdf/24cfr3500.21.pdf. The 2007 HUD-1 can be found at 24 C.F.R. Pt. 3500 App. A (2007), available at http://edocket.access.gpo.gov/cfr_2007/aprqtr/pdf/24cfr3500.21.pdf. Because we are unsure which HUD-1 form the borrowers received from Quicken, we refer to the 2007 version in this opinion. The parts of that HUD-1 relevant to the case here are lines 800, "**Items Payable In Connection With Loan**," and 802, "Loan Discount _____ %."

[4] The terms of the Wootens' note appear in the note attached to Quicken's motion to dismiss.

4

points." Compl. ¶ 8. Nonetheless, as indicated on line 802 of the HUD-1 that Quicken gave them at closing,[5] id. ¶ 16, they paid a "Loan Discount" of 4.5% for the interest rate stated in their mortgage note, 5.875%.[6]

B.

On July 3, 2006, the Buckhaults entered into a residential mortgage transaction with Quicken. The Buckhaults executed a "Note" for $140,000, payable in 15 years, at a fixed interest rate of 6.500% per annum.[7] "Quicken charged the Buckhaults a loan discount fee of $2,100.00, an amount equal to 1.5% of their loan amount. The Buckhaults did not negotiate for a buy-down of the interest rate nor did they receive a lower interest rate in return for paying points." Id. ¶ 9. Nonetheless, as indicated on line 802 of the HUD-1 that Quicken gave them at closing, id. ¶ 16, they paid points, a "Loan Discount" of 1.5% for the

---

[5] The complaint implies, but does not affirmatively state, that "a lower interest rate" means an interest rate lower than the going-market rate, i.e., the rate a mortgage lender, like Quicken, would charge similarly situated home buyers. The complaint does not identify the going-market rate.

[6] The complaint does not reveal the interest rate the Wootens agreed to pay for the loan. The complaint suggests that 5.875% was the rate charged for loans made to home buyers whose financial stability was similar to the Wootens'. Thus, Quicken did not need to charge points for granting the Wootens a mortgage at 5.875%.

[7] The terms of the Buckhaults' notes appear in the notes attached to Quicken's motion to dismiss.

5

interest rate stated in their mortgage note, 6.500%.[8]

The Buckhaults and Quicken entered into a second residential mortgage transaction on April 6, 2007. Id. ¶ 10. The Buckhaults executed an "Interest First Note" for $142,800, payable in 30 years, at a fixed interest rate of 6.125% per annum.[9] "This time Quicken charged the Buckhaults a loan discount fee of $1,963.50, an amount equal to 1.375% of their loan amount. The Buckhaults did not negotiate for a buy-down of the interest rate nor did they receive a lower interest rate in return for paying points." Id. Nonetheless, as indicated on line 802 of the HUD-1 that Quicken gave them at closing, id. ¶ 16, they paid a "Loan Discount" of 1.375% for the interest rate stated in their mortgage note, 6.125%.[10]

## II.

The Wootens and Buckhaults instituted this class action on July 2, 2007. Their complaint contained two counts, both founded on the facts recited in parts

---

[8] As in the Wootens' case, the complaint reveals neither the interest rate the Buckhaults agreed to pay for the loan nor the going-market rate. The complaint, however, suggests that 6.500% was the rate charged for loans made to home buyers whose financial stability was similar to the Buckhaults'. Thus, Quicken did not need to charge points for granting the Buckhaults a mortgage at 6.500%.

[9] The note attached to Quicken's motion to dismiss is described as an "Interest First Note" and reveals the terms indicated in the text.

[10] As in the case of the Buckhaults' July 3, 2006 loan, the complaint does not reveal the interest rate the Buckhaults agreed to pay for the loan. The complaint suggests that Quicken did not need to charge points for granting the Buckhaults a mortgage at 6.125%, i.e., that 6.125% was the rate charged for loans made to home buyers whose financial stability was similar to the Buckhaults' at the time the loans were made.

I.A and I.B. Count I, brought under § 8(b) of RESPA, 12 U.S.C. § 2607(b) and 24

C.F.R. § 3500.14(c), alleged that Quicken charged the Wootens and Buckhaults a

"'Loan Discount' fee for which no interest rate discount was given or bargained for

. . . ." Id. ¶ 1. Specifically,

> The section 802 charges listed on the HUD-1s were imposed for
> services that were not bona fide, not rendered, not paid or for nominal,
> unreasonable or duplicative services for which no fees were earned
> and for which no fees should have been imposed, all in violation of
> RESPA at 12 U.S.C. § 2607, and RESPA's implementing regulations,
> Regulation X, at 24 C.F.R. § 3500.14.[11]

Id. ¶ 33. Stripped to its essentials, Count I alleges that the agreements the

Wootens and Buckhaults made with Quicken did not call for a discounted interest

rate and thus did not require the payment of a loan discount, or points. They

nonetheless paid the points, receiving nothing in return.

---

[11] Section 3500.14(c) states:

> No split of charges except for actual services performed. No person shall give
> and no person shall accept any portion, split, or percentage of any charge made or
> received for the rendering of a settlement service in connection with a transaction
> involving a federally related mortgage loan other than for services actually
> performed. A charge by a person for which no or nominal services are performed
> or for which duplicative fees are charged is an unearned fee and violates this
> section. The source of the payment does not determine whether or not a service is
> compensable. Nor may the prohibitions of this Part be avoided by creating an
> arrangement wherein the purchaser of services splits the fee.

24 C.F.R. § 3500.14(c). Note that the first sentence of § 3500.14(c) adopts verbatim the
language of 28 U.S.C. § 2607(b), except that it omits the words "real estate" between
"rendering" and "service."

7

Count II, claims for breach of contract,[12] alleged as follows: "Quicken and Plaintiffs entered into . . . contract[s] and . . . Quicken[] . . . charg[ed] Plaintiffs for points [but did] not actually provid[e] a[n] interest rate discount or alternatively . . . charge[d] for points when no agreement was made for points." Id. ¶ 19.c. Quicken "breached [the] contract[s] by charging Plaintiffs a loan discount fee without actually providing a lower interest rate or other reasonable service in return." Id. ¶ 38. The gist of Count II is that the Wootens and Buckhaults paid Quicken for a discounted interest rate but did not receive one, or, alternatively, Quicken charged the Wootens and Buckhaults points they were not supposed to pay.

Having laid out the facts surrounding the mortgage loan transactions as described in the complaint, we turn now, in part III, to the sufficiency of Count I to state a case for relief under § 8(b) of RESPA and Regulation X. In part IV, we consider whether Count II states a case for breach of contract.

### III.

The district court concluded that points are not a "settlement service," within the meaning of § 8(b) of RESPA, but a sum paid to provide an interest rate lower than the interest rate the market required.[13] The court thus treated the points as part

---

[12]  We assume that Count II was brought under Alabama law because the agreements between the Wootens and Buckhaults and Quicken were made in Alabama.

[13] The district court refused plaintiffs' suggestion that, in determining whether Quicken violated § 8(b) of RESPA, it defer to a 2004 audit report prepared by HUD's inspector general.

of the interest Quicken charged for the loans.

For a mortgage lender's charging of points to violate § 8(b), the points must be charged or received "for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan." Accordingly, in reviewing the district court's dismissal of Count I, we begin with the question of whether points represent a charge for rendering a "settlement service." If they do not, we proceed to the question of whether the points Quicken charged constituted payment for settlement services rather than for providing the borrowers with below-market interest rates.

## A.

We begin our analysis with the text of RESPA, noting that we are necessarily limited in our interpretation of "settlement service" by the statutory definition and the regulations interpreting it. See, e.g., Schwarz v. City of Treasure Island, 544 F.3d 1201, 1214 (11th Cir. 2008) (contemplating the meaning of "residence" in the context of defining "dwelling," beginning with the definitions provided by the applicable statute and HUD regulations and, finding nothing

The report stated that a mortgage lender that charges points but does not provide the borrower with a below-market interest rate violates § 2607(b). The court noted that the inspector general is only subject to limited supervision, and that the audit report was not issued after notice and comment or any other agency deliberation. Therefore, the report was entitled to no deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). See Christensen v. Harris Cnty., 529 U.S. 576, 587, 120 S. Ct. 1655, 1662–63, 146 L. Ed. 2d 621 (2000). We agree.

9

applicable, proceeding to the common or ordinary meaning of the term).  RESPA

defines a "settlement service" as "any service provided in connection with a real

estate settlement."  12 U.S.C. § 2602(3).  Examples of qualifying services include:

> (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans); (2) Rendering of services by a mortgage broker (including counseling, taking of applications, obtaining verifications and appraisals, and other loan processing and origination services, and communicating with the borrower and lender); (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan; (4) Provision of title services, including title searches, title examinations, abstract preparation, insurability determinations, and the issuance of title commitments and title insurance policies; (5) Rendering of services by an attorney; (6) Preparation of documents, including notarization, delivery, and recordation; (7) Rendering of credit reports and appraisals; (8) Rendering of inspections, including inspections required by applicable law or any inspections required by the sales contract or mortgage documents prior to transfer of title; (9) Conducting of settlement by a settlement agent and any related services; (10) Provision of services involving mortgage insurance; (11) Provision of services involving hazard, flood, or other casualty insurance or homeowner's warranties; (12) Provision of services involving mortgage life, disability, or similar insurance designed to pay a mortgage loan upon disability or death of a borrower, but only if such insurance is required by the lender as a condition of the loan; (13) Provision of services involving real property taxes or any other assessments or charges on the real property; (14) Rendering of services by a real estate agent or real estate broker; and (15) Provision of any other services for which a settlement service provider requires a borrower or seller to pay.

24 C.F.R. § 3500.2.  In addition, both "the provision of title certificates" and "the

handling of the processing, and closing or settlement" qualify.  12 U.S.C.

§ 2602(3).

10

"Settlement" is defined as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2.

While the non-exhaustive, but illustrative, list of examples provides some guidance, neither the statutory text nor the regulations define what is meant by "service." Failing a statutory or regulatory definition, we must turn to its common and ordinary meaning. Schwarz, 544 F.3d at 1214 (citing Nat'l Coal Ass'n v. Chater, 81 F.3d 1077, 1081 (11th Cir. 1996)).

Black's Law Dictionary defines "service" as "the act of doing something useful for a person or company, usu[ally] for a fee." Black's Law Dictionary 1491 (9th ed. 2009). The definition in Webster's Third New International Dictionary is substantially the same: "action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something: deeds useful or instrumental toward some object." Webster's Third New Int'l Dictionary 2075 (1993); see also Webster's New World Dictionary 1226 (3d ed. 1988) (defining "service" as "an act giving assistance or advantage to another," including "friendly help; also, professional aid or attention"). As these sources suggest, the service referred to by RESPA includes any act undertaken to bring about the execution of a mortgage and note. Cf. United States v. Graham Mortg. Corp., 740 F.2d 414, 418

11

(6th Cir. 1984) ("[T]he common thread running among the listed services is that each is an ancillary or peripheral service that . . . is not directly related to the closing of a real estate sale covered by RESPA.").[14]  That definition does not include the act of negotiating advance interest terms such as points.

We can find nothing in the legislative history surrounding Congress's 1992 amendments to RESPA, which were enacted specifically in response to Graham, to suggest a broader definition of "settlement service."  Prior to the amendments,  the definition of "settlement service" ended with the phrase "services rendered by a real estate agent or broker."  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1298–99 (11th Cir. 2002).  After Graham held that the making of mortgage loans was not a "settlement service," Congress responded by adding the phrase "the origination of federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans)."  Pub. L. No. 102-550, § 908, 106 Stat. 3672, 3873–74 (1992).  House Report 102-760 explained the reason behind the change:

---

[14]  In Graham, a criminal indictment charged a mortgage company, its individual officers, and a real estate developer with giving and accepting kickbacks in violation of § 2607(a). United States v. Graham Mortg. Corp., 740 F.2d 414, 416 (6th Cir. 1984).  Interpreting a previous definition of settlement services, the Sixth Circuit held that the lender's provision of interim financing at a reduced interest rate without the payment of points in exchange for the developer's agreement to refer all its business to the lender was not a "settlement service"; in other words, "the making of a mortgage loan is [not] a settlement service for purposes of RESPA."  Id. at 418–19.

12

> This mortgage origination issue is before the Committee because of the <u>Graham</u> decision. <u>United States v. Graham Mortgage Corp.</u>, 740 F.2d 414 (6th Cir. 1984). In that case, Graham Mortgage Corporation was accused of violating the anti-kickback provisions of section 8(a) of RESPA by charging a developer fewer "points" on mortgage loans than it customarily charged in exchange for the developer's referral to GMC of other mortgage loan customers. Although the Sixth Circuit rejected the government's argument by reasoning that the statutory definition of settlement services did not clearly extend to mortgage lending procedures, the Committee believes that mortgage lending must be included as a settlement service to preserve the effectiveness of RESPA as a consumer protection statute.

H.R. Rep. No. 102-760, at 158 (1992), <u>reprinted in</u> 1992 U.S.C.C.A.N. 3281, 3438.

The amendments do not alter our analysis.

As a preliminary matter, we dispense with any comparison to <u>Graham</u>. That case involved a loan origination fee, "a fee charged by a lender to cover the <u>administrative costs</u> of making a loan." <u>Black's Law Dictionary</u> 690 (9th ed. 2009) (emphasis added). This case, in contrast, involves the payment of loan discount points. <u>See</u> <u>Graham</u>, 740 F.2d at 415 n.2 (defining "point" as a fee or charge collected at the inception of the loan, including <u>both</u> loan origination and discount payments, in addition to the long-term interest rate stated on the face of the loan).

Moreover, we must note, as the district court did, that RESPA is still limited to "services," a term the statute leaves undefined and that the court in <u>Graham</u> did not address. <u>Id.</u> at 418 ("Because of the illumination provided by the list of settlement services in § 3(3) of RESPA, we need not rely upon any purported

13

common understanding of the term 'service', assuming that such an understanding exists."). We cannot conceive of a circumstance in which the charging of loan discount points would qualify under our definition of "service." The points paid by the Wootens and Buckhaults were ostensibly in exchange for an interest rate below market, i.e., to "raise the yield on the loan to the market rate." VanDenBroeck v. CommonPoint Mortg. Co., 210 F.3d 696, 702 (6th Cir. 2000) (citations omitted), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008). As such, the points affect the interest rate and go to the very heart of the loan itself.

The Wootens and Buckhaults "do not disagree that the interest rate on the mortgage note is not, per se, a settlement service." Br. of Appellants at 40. Instead, as prima facie evidence that discount points qualify as a "settlement service," they rely on HUD's placement of the loan discount fee within the 800 number series dedicated to **Items Payable In Connection With Loan** and an informational booklet provided to potential borrowers.[15] Neither argument is

[15] HUD prepared and distributed the booklet to lenders to be made available to borrowers pursuant to 24 C.F.R. § 3500.6. It states:

A. Specific Settlement Costs

This part of the Booklet discusses the settlement services which you may be required to get and pay for and which are itemized in Section L of the HUD-1 Settlement Statement.
. . . .

14

availing.

The HUD-1 that Quicken provided the Wootens and Buckhaults discloses discount points on line 802.  Line 801 concerns the "Loan Origination Fee," line 803 the "Appraisal Fee," line 804 the "Credit Report," line 805 the "Lender's Inspection Fee," line 806 the "Mortgage Insurance Application Fee," and line 807 the "Assumption Fee."  Because every item in the 800-series, save line 802, represents a fee for a "settlement service," the Wootens and Buckhaults infer that discount points are also qualifying fees.  We do not draw such inference.  Points in this context are part of the loan agreement, not a service provided to borrowers; therefore, regardless of its location on the HUD-1, the line 802 charge could not be for a "settlement service."

More troubling, however, is their suggestion that we should defer to the accompanying booklet for our definition of settlement services.  HUD regulations specifically state that the special information booklet is not a "rule, regulation, or interpretation" for purposes of RESPA, 24 C.F.R. § 3500.4, meaning that even if

---

802. Loan Discount: Also called "points" or "discount points," a loan discount is a one-time charge imposed by the lender or broker to lower the rate at which the lender or broker wold otherwise offer the loan to you.  Each "point" is equal to one percent of the mortgage amount.  For example, if a lender charges two points on a $80,000 loan this amounts to a charge of $1,600.

A version of the booklet as described by the Wootens and Buckhaults may be found at U.S. Dep't of Hous. & Urban Dev.—Fed. Hous. Admin., Buying Your Home: Settlement Costs and Helpful Information, available at http://www.hud.gov/offices/hsg/ramh/res/stcosts.pdf.

the statutory language were unclear, we would owe the booklet no deference under

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,

104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). See Thorpe v. Housing Auth. of

Durham, 393 U.S. 268, 275, 89 S. Ct. 518, 522, 21 L. Ed. 2d 474 (1969)

(comparing a regulation promulgated in a HUD manual to handbooks and booklets

and concluding the latter are "mere 'instructions,' 'technical suggestions,' and

'items of consideration'").

In sum, based on our understanding of the statutory text, we conclude that

points are not a "settlement service." We now proceed to the question of whether,

as the Wootens and Buckhaults contend, the points they paid were not for a below-

market interest rate but, instead, were for services unrelated to interest.

B.

In reviewing de novo the district court's dismissal of Count I,[16] we, like the

district court, assume that the factual allegations in the complaint are true and give

the plaintiffs the benefit of reasonable factual inferences.

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is
> plausible on its face. A claim has facial plausibility when the plaintiff
> pleads factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged. The

---

[16] We review de novo the sufficiency of Counts I and II. Hazewood v. Found. Fin. Grp., LLC, 551 F.3d 1223, 1224 (11th Cir. 2008).

16

> plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. ----, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks and citations omitted).

Count I does not satisfy this plausibility standard. Implicit in the allegations of the complaint is the fact that the Wootens and Buckhaults, on the one side, and Quicken, on the other, had different understandings of the interest the Wootens and Buckhaults would be paying on their mortgage loans. The Wootens and Buckhaults thought they would be paying the going rate of interest; they were not seeking a lower rate of interest for which they would have to pay points. Quicken thought the borrowers wanted to obtain a specific below-market rate and would pay points to obtain it. Quicken's understanding was evidenced in the notes the borrowers signed after reading the loan documents, including the HUD-1s and the entry on line 802, "Loan Discount ___ %." Quicken's understanding was confirmed when the borrowers made no objection to paying the advance interest the points called for,[17] as indicated in the HUD-1s, and proceeded to close the

---

[17] In addition to paying 4.5 points for the initial fixed rate of interest, 5.875%, on the "Adjustable Rate Note" they signed, the Wootens agreed to pay points on the interest charged when, and if, the interest rate changed on August 1, 2013, and "on that day every 6th month thereafter." See Adjustable Rate Note ¶ 4(A). The "adjustable interest rate will be based on an

17

loans.

Except for its allegation that the Wootens and Buckhaults "did not negotiate for a buy-down of the interest rate nor did they receive a lower interest rate in return for paying points," Compl. ¶¶ 8–10, the complaint offers nothing to explain away the obvious fact that they willingly paid points in order to close the mortgage transactions in accordance with their terms.[18] The inescapable inference is that the borrowers obtained the specific below-market interest rates they bargained for—and that their claim to the contrary is manifestly implausible. Though the complaint alleges that the points were exorbitant and "disguised unearned fees" for services, id. ¶ 17, it nevertheless fails to identify any services that were not provided in keeping with § 8(b) of RESPA and 24 C.F.R. § 3500.14(c).

Faced with these facts, the district court properly held that the loan discounts constituted appropriately agreed upon points for specific below-market interest rates and not a cover for unearned fees for services. We therefore affirm the court's dismissal of Count I of the complaint.

_____

Index. The 'Index' is the average of interbank offered rate for six month U.S. dollar-denominated deposits in the London market ('LIBOR'), as published in The Wall Street Journal." Id. ¶ 4(B).

[18] We say this because nowhere in the complaint is it alleged that the Wootens and Buckhaults did not read the notes they signed and line 802 of the HUD-1. Nor is it alleged that Quicken fraudulently misrepresented the requirement that the Wootens and Buckhaults pay the points in order to obtain the specified interest rates.

IV.

The district court dismissed Count II on the ground that the complaint's allegations failed to establish that Quicken breached its contracts with the Wootens and Buckhaults. We affirm the court's ruling. We do so for the reasons stated in part III.B; the complaint's allegations demonstrate that by the time the mortgage loans were closed, the parties reached a meeting of the minds and that the Wootens and Buckhaults received what they bargained for.

AFFIRMED.