# United States Court of Appeals for the Federal Circuit

---

**GENERAL DYNAMICS CORPORATION,**
*Appellant,*

**v.**

**Leon E. Panetta, SECRETARY OF DEFENSE,**
*Appellee.*

---

2012-1249

---

Appeal from the Armed Services Board of Contract Appeals in No. 56744, Administrative Judge Robert T. Peacock.

---

Decided: May 9, 2013

---

MATTHEW S. HELLMAN, Jenner & Block, LLP, of Washington, DC, argued for appellant. With him on the brief were PAUL M. SMITH and JESSICA RING AMUNSON.

DAVID D'ALESSANDRIS, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and KIRK T. MANHARDT, Assistant Director.

MARCIA G. MADSEN, Mayer Brown, LLP, of Washington, DC, for amicus curiae. With her on the brief was CAMERON S. HAMRICK.

---

Before LOURIE, PROST, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LOURIE.

Dissenting opinion filed by *Circuit Judge* WALLACH.

LOURIE, *Circuit Judge.*

General Dynamics Corporation ("General Dynamics") appeals from the decision of the Armed Services Board of Contract Appeals ("ASBCA") denying its appeal from the contracting officer's ("CO") final determination of non-compliance with Cost Accounting Standards ("CAS") 412 based upon General Dynamics' use of a partial-year asset valuation in computing its retirement plan forward pricing rates. *Appeal of Gen. Dynamics Corp.*, ASBCA No. 56744, 11-2 BCA ¶ 34,787, *modified on recons.*, 11-2 BCA ¶ 34,875. Because the ASBCA did not err in denying General Dynamics' appeal, we *affirm*.

## BACKGROUND

General Dynamics entered into contracts with the Department of Defense, including, *inter alia*, fixed-price contracts, fixed-price incentive contracts, cost-plus-fixed-fee contracts, cost-plus-award-fee contracts, and time-and-materials contracts. Many of these contracts contain a clause requiring compliance with CAS. Such contracts were thus covered by the CAS, which, in general, "provide[s] uniformity in how contractors measure, assign, and allocate costs to Government contracts." *Gates v. Raytheon Co.*, 584 F.3d 1062, 1064 (Fed. Cir. 2009). CAS 412, at issue in this appeal, "provide[s] guidance for determining and measuring the components of pension cost." CAS 412-20(a). It is primarily concerned with the

way in which contractors account for their incurred pension costs, and hence how much of those costs may be charged to the government.

In estimating pension costs, the CAS calculation relies on a number of actuarial assumptions. CAS 412-30(a)(3) defines an "actuarial assumption" as "an estimate of future conditions affecting pension cost." "Each actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations." CAS 412-40(b)(2). Those "[a]ctuarial assumptions shall reflect long-term trends so as to avoid distortions caused by short-term fluctuations," CAS 412-50(b)(4), and include "mortality rate, employee turnover, compensation levels, earning on pension plan assets, [and] changes in values of pension plan assets," CAS 412-30(a)(3). For the periods relevant to this appeal, General Dynamics estimated, and the government agreed, that its pension fund would grow at 8% per year from January 1 of the years in question, *viz.*, from 2004 through 2008.

At the beginning of each year, as of January 1, General Dynamics conducts a valuation of its pension fund, which allows it to determine what pension costs it is permitted to charge to the government under its contracts based on the actual value of its pension plan. That calculation compares the expected value from the prior year's estimation (assuming 8% growth from the previous January 1) with the actual value on January 1.

General Dynamics also submits a second evaluation pursuant to the Federal Acquisition Regulations ("FAR") to estimate the future value of its pension fund to calculate what is known as the retirement plan forward pricing rate ("RPFPR") for new contracts and contract modifications. *See* FAR 42.1701(b) ("The [CO] shall obtain the contractor's forward pricing rate proposal and require

that it include cost or pricing data that are accurate, complete, and current as of the date of submission . . . ."). The RPFPR calculation involves a projection of pension plan asset values for the current base year as well as projections between three and nine years out. While it was disputed before the ASBCA, neither party disputes on appeal that the CAS 412 regulations apply to the FAR RPFPR projections.

Over the last 25 years, General Dynamics has variably used midyear asset values, instead of January 1 values, in setting its updated RPFPR proposal for a base year. General Dynamics combined the previously mentioned 8% per year pension growth rate estimate, prorated, with that midyear value to create a "blended" rate for the remainder of the base year, and then applied the long-term 8% rate for the remaining years in the three to nine year projection in the RPFPR. Viewed differently, General Dynamics combined two rates: the actual growth rate from January 1 to the midyear date and the 8% per year rate, pro-rated, from that midyear date until the end of the year.

The Defense Contract Management Agency notified General Dynamics in 2006 that its use of a blended rate using partial-year valuations did not comply with CAS 412. The CO issued a final notice of noncompliance with CAS 412 in 2007. Following the final notice, General Dynamics submitted a compliant retirement plan using the 8% rate from January 1, not the blended rate. However, in 2008, General Dynamics once again submitted a retirement plan using the blended rate for the base year. The CO issued a second final determination of noncompliance with CAS 412. General Dynamics appealed to the ASBCA.

The ASBCA denied General Dynamics' appeal, determining that General Dynamics' use of partial-year asset data reflected short-term fluctuations that could and did

introduce distortion prohibited by CAS 412-50(b)(4). The ASBCA also determined that General Dynamics' substitution of a midyear value and a blended rate in place of the 8% long-term estimate rate constituted "actuarial assumptions" because they were "estimate[s] of future conditions affecting pension cost" as defined in CAS 412-30(a)(3). Thus, according to the ASBCA, they are encompassed by the prohibitions of CAS 412-50(b)(4). This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

In accordance with the Contract Disputes Act, 41 U.S.C. §§ 7101–7109, this court reviews the ASBCA's decisions on questions of law *de novo*. *See* 41 U.S.C. § 7107(b)(1); *Ra–Nav Labs. v. Widnall*, 137 F.3d 1344, 1346 (Fed. Cir. 1998). We may set aside the ASBCA's determination on a question of fact only if it is "fraudulent, arbitrary, or capricious; . . . so grossly erroneous as to necessarily imply bad faith; or . . . not supported by substantial evidence." § 7107(b)(2). A determination is adequately supported if it is based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *E.L. Hamm & Assocs. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004).

General Dynamics argues that the ASBCA erred in holding that its use of a partial-year asset valuation and subsequent blended rate in its RPFPR violated CAS 412-50(b)(4). In support of its position, General Dynamics notes that it has been using that method for 25 years without government objection. General Dynamics contends that the use of a current, midyear value is a historical fact, not an "actuarial assumption" as it is not an estimate of future conditions, although they conceded in oral argument that "in this court . . . we need to comply with CAS 412 and that we do so." Oral Argument (Feb. 6, 2013) at 3:43–51, *available at*

http://www.cafc.uscourts.gov/oral-argument-recordings/all/general-dynamics.html. According to General Dynamics, the only assumption made is the uncontroverted 8% *per annum* growth, whereas the blended rate, calculated from the actual midyear value and the 8% estimate, is not an actuarial assumption because it is based on historical fact as well as the 8% growth rate. Because, in its view, the midyear value and the resulting blended rate are not actuarial assumptions under CAS 412-30(a)(3), General Dynamics argues that the use of both of them cannot violate CAS 412-50(b)(4), which only applies to actuarial assumptions. General Dynamics also points to other provisions that require accurate estimation that General Dynamics alleges raise conflicting obligations for contractors forced to use the government's less accurate accounting method. Appellant's Br. 46–50 (citing CAS 412-40(b)(2) ("best estimates . . . taking into account past experience and reasonable expectations"); FAR 2.101 (defining forward pricing rate agreements as having rates representing "reasonable projections of specific costs"); FAR 42.1701(b) (stating that the CO shall require that the forward pricing rate proposal includes "accurate, complete, and current" cost or pricing data); 10 U.S.C. § 2306a(a)(2) ("TINA") (requiring a contractor to submit cost or pricing data that is "accurate, complete, and current")).

The government responds that General Dynamics' use of both the midyear market value of its pension plan and the subsequent blended rate are both "actuarial assumptions" under CAS 412-30(a)(3). The government argues that these actuarial assumptions, because they rely on midyear values, inherently reflect short-term fluctuations and cause distortions in violation of CAS 412-50(b)(4). The government contends that the relative accuracy of General Dynamics' method is irrelevant because the purpose of the CAS regulations is uniformity and consistency, not accuracy.

We agree with the government that General Dynamics' use of midyear market values and the subsequent blended rate for the base year violate CAS 412-50(b)(4). First, both the midyear market value and the subsequent blended rate are actuarial assumptions. CAS 412-30(a)(3) defines an "actuarial assumption" as an "estimate of future conditions affecting pension cost." As a matter of principle, we agree with General Dynamics' proposition that the actual value of the plan assets on a given day is a historical fact, not an actuarial assumption. That historical fact, however, must be distinguished from the two decisions concerning which data point to use and how that data point affects the established rate.

The parties do not dispute that the assumed 8% return from January 1 is an actuarial assumption regardless of the actual value of the assets on January 1. In that circumstance, both the date chosen and the rate applied are actuarial assumptions. The decision to use a day other than January 1 combined with blending that value with a pro-rated 8% growth rate is likewise an actuarial assumption because it is effectively substituting a new rate and base date in place of the original 8% growth rate from January 1. Stated another way, the use of a given midyear value assumes that the value from that midyear date is a viable predictor of long-term future pension costs just as the assumption that 8% growth from January 1 was agreed to be. The new blended rate from the midyear date is thus as much "an estimate of future conditions affecting pension cost" as the original 8% rate from January 1. Thus, both the choice of a specific midyear date and the resulting blended rate are actuarial assumptions governed by CAS 412-50(b)(4).

Second, we also agree with the government that General Dynamics' use of the midyear value and the resulting blended rate violates CAS 412-50(b)(4) because it does not "reflect long-term trends so as to avoid distortions caused by short-term fluctuations." CAS 412-50(b)(4). As is self-

evident, the use of a midyear value inherently reflects such short-term fluctuations in relation to January 1, because that value is based on the partial-year, short-term trend since January 1.

Contrary to General Dynamics' assertion, the presumed accuracy of the midyear value in the base year does not make the use of that value and the subsequent blended rate compliant with CAS. Indeed, the "accuracy" argument raised by General Dynamics ignores the fact that the forward pricing rate is not only for the base year, but for a projection from three to nine years into the future. Indeed, even if General Dynamics' approach may be an accurate representation over the short term, that is only because it impermissibly reflects short-term fluctuations. General Dynamics' method improperly locks in that short-term fluctuation causing a distortion that alters the level of growth throughout the rest of the projection.

As the government notes, the purpose of CAS is to "enhance uniformity and consistency." CAS 412-20(a). No mention in the regulation is made of accuracy or even the short-term accuracy offered by General Dynamics' approach. Allowing a contractor to use General Dynamics' methodology, which is based on random or arbitrary sampling dates throughout the year, does not promote such uniformity and consistency. On the contrary, it promotes the opposite: manipulation by self-interested selection of the pricing date. While there is no evidence that General Dynamics self-selected a midyear date to take advantage of a short-term market change, the risk that any party using General Dynamics' approach could do just that is quite apparent. It is entirely plausible that a company, after a sharp market turn in its favor, would choose to update its retirement plan forward pricing rates using a midyear value that benefited its interest when compared to the January 1 date or some other midyear

date. That risk of manipulation is contrary to the goals of uniformity and consistency.

Moreover, uniformity and consistency are clearly missing in General Dynamics' methodology as evidenced by a brief review of General Dynamics' choice of dates. Over the last 25 years, General Dynamics has used valuation dates from January, June, July, August, and October, varying not only the month, but also the date within the month—using both mid-month and end-of-the-month values. The date of the asset valuation has also ranged from five days prior to the forward pricing rate submission to as much as 42 days prior. The practice espoused by General Dynamics is thus contrary to uniformity and consistency.

As for the other CAS, FAR, and TINA provisions cited by General Dynamics, we do not see a conflict. First, after reviewing the provisions, we see no inconsistent obligations, although we leave open the possibility of some unforeseen conflict in a future case. Second, to the extent CAS and FAR conflict as to the allocability of costs, the more specific CAS provisions control. *See, e.g., United States v. Boeing Co.*, 802 F.2d 1390, 1395 (Fed. Cir. 1986) (CAS regulations trump Defense Acquisition Regulations). General Dynamics' concerns of conflicting obligations are thus premature and not persuasive.

We have considered General Dynamics' remaining arguments and do not find them persuasive. We find no error in the ASBCA's well-reasoned decision. Accordingly, we *affirm*.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**GENERAL DYNAMICS CORPORATION,**
*Appellant,*

**v.**

**Leon E. Panetta, SECRETARY OF DEFENSE,**
*Appellee.*

---

2012-1249

---

Appeal from the Armed Services Board of Contract Appeals in No. 56744, Administrative Judge Robert T. Peacock.

---

Decided: May 9, 2013

---

WALLACH, *Circuit Judge*, dissenting.

General Dynamics ("GD") is required to project future values of its pension funds. To do so, it takes the actual market value of the fund and applies an assumption about the fund's rate of future growth. Both the Government and GD agree that the appropriate assumed growth rate is 8% per annum. However, the parties do not agree as to what value the 8% growth rate should be applied. The Government argues that the 8% rate must be applied to the value of the fund on January 1 of the year that GD makes the projection. GD argues that it may use the

most current value of the fund and is not required by the CAS to ignore what actually happened in the market between January 1 and the time of valuation. GD is correct.

The ASBCA's decision denying GD's appeal rests on two invalid assumptions, either of which, if corrected, is sufficient to mandate reversal: First, GD's use of current, intra-year data is not an "actuarial assumption" within the meaning of CAS 412; Second, even if the data used is an actuarial assumption, the actuarial assumption does not result in "distortions caused by short-term fluctuations." CAS 412-50(b)(4). For each reason, the Government did not carry its burden to prove a CAS violation. I respectfully dissent from the majority's contrary holding.

1. The Use of Current, Intra-Year Data is Not an Actuarial Assumption

"Actuarial Assumption" is defined by the CAS as "an estimate of future conditions affecting pension cost . . . ." CAS 412-30(a)(3). The intra-year data used by GD is the market value of its pension fund on a chosen date. This is a present reality, not an estimate of a future condition. Applying the agreed-upon annualized 8% growth rate to the intra-year data does not convert the data itself into a "future condition." Thus, CAS 412 is inapplicable to GD's decision to use intra-year data rather than January 1 data, because neither is an actuarial assumption.

Common sense dictates that the data to which an assumption is applied does not itself become an assumption. Otherwise, the values to which actuarial assumptions are applied would become "actuarial assumptions" themselves. Examples of actual actuarial assumptions offered by the regulation include: "mortality rate, employee turnover, compensation levels, earnings on pension plan assets, [and] changes in value of pension plan assets." CAS 412-30(a)(3). GD's use of intra-year data as the baseline to which the agreed upon actuarial assumption is

applied is nothing like these enumerated examples. *See, e.g., Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012) (noting the "commonsense canon of *noscitur a sociis*, which counsels that a word is given more precise content by the neighboring words with which it is associated" (internal quotation marks and citation omitted)).

The majority agrees that "[a]s a matter of principle, . . . a value of the plan assets on a given day is a historical fact, not an actuarial assumption." Majority Op. at 7. However, it concludes that the decision to use a day other than January 1 is an actuarial assumption because it "effectively substitut[es] a new rate and base date in place of the original 8% growth rate from January." *Id.*

That analysis erroneously assumes that calculating the projected market value for next January 1 must begin from the market value on January 1 of the current year. However, the agreed-upon assumption of 8% annualized growth does not require growth at 8% for a year, but simply assumes 0.0219% growth per day. The assumption of annualized 8% growth can thus be applied to the fund's market value on July 1 just as it may be applied to the value on January 1.

The Government provides no reason why the January 1 fund value of the previous year should carry talismanic significance in calculating the projected market value on January 1 for next year and years to come. As pointed out by GD, "[t]here is nothing 'long-term' about using January 1 numbers as a baseline. The January 1 fund value is not an average of the fund's value over a period of time, it is simply the value of the fund on a given date, just like the value of the fund on any other date, like June 15 or August 1." Reply Br. at 2. Once we are freed from the January 1 start date, it becomes clear that applying the 8% growth rate to the intra-year market value does

not result in an improper "blended" rate, but is simply an application of the 8% growth rate to market data.[1]

The majority's conclusion to the contrary unnecessarily brings CAS 412 into conflict with the FAR requirement that a contractors' forward pricing rate "include cost or pricing data that are accurate, complete, and current as of the date of submission . . . ." FAR 42.1701(b). This FAR provision requires use of up-to-date information to calculate the forward pricing rate. *See also* FAR 2.101 (forward pricing rates must be "reasonable projections of specific costs . . . ."). On its face, this requirement is consistent with the CAS goal of "uniformity and consistency." CAS 412-20(a). Properly interpreted, these provisions together require that actuarial assumptions be consistently applied to accurate and current data, which is consistent with GD's reliance on intra-year data.

The Government has a reasonable interest in uniformity. However, the precatory language of CAS 412 promoting "uniformity and consistency" is not an independent obligation, and it is the Government's burden to persuade the court that the approach employed by GD is in violation of the applicable regulations. The Government has not carried this burden.[2] Indeed, if the Government is concerned about uniformity, it can take steps such as requiring contractors to estimate intra-year values on particular dates or based on the occurrence of

---

[1]    Both the majority and the ASBCA use the phrase "blended rate." However, this term is inaccurate. GD does not, as the majority claims, combine two rates, Majority Op. at 4, but applies one rate, pro-rated, to the value of the fund at a given day.

[2]    Arguably, for the sake of uniformity and consistency, GD's practice employed for over twenty-five years should continue to be the standard practice.

particular events.   The answer is not to bend the provisions of the CAS to apply to a situation it plainly should not.

### 2.   The Use of Current, Intra-Year Data Does Not Result in "Distortions Caused by Short-Term Fluctuations"

Even if GD's method is to be considered an "actuarial assumption," it does not result in "distortions caused by short-term fluctuations."  The record is devoid of evidence supporting this proposition and is fatal to the Government's position.

Instead, the record shows that GD's method results in more accurate projections.   It is uncontested that the actual performance of the market in the first months of 2008 departed significantly from the hypothesized 8% rate.  The Government does not dispute that GD's method resulted in a more accurate projection of the fund's future market value for January 1, 2009.   But it argues that there is nevertheless a "distortion" because the later 2010, 2011, and 2012 values may not be more accurate. Appellee's Br. at 20.   In response, GD offers the following information showing that GD's projection was more accurate than the Government's proposed projection for all known years:



Reply Br. at 15.  The fact that the actual performance of the market in the first months of 2008 departed significantly from the hypothesized 8% rate does not establish that there is any "distortion" involved in taking account of that real-world information.  To the contrary, using more up to date data resulted, as may be expected, in more accurate projections.[3]

The majority states that "[a]s is self-evident, the use of a midyear value inherently reflects such short-term fluctuations in relation to January 1, because that value is based on the partial-year, short-term trend since January 1." Majority Op. at 7-8.  However, a review of the record illustrates there is no evidence supporting the

---

[3]    This result is logical.  GD and the Government use an identical method of calculating projected pension market values—add an 8% annual rate to the projected end-of-year value.  The more accurate the first projection is, the more accurate subsequent estimates will be.

proposition that GD's practice introduces distortions, nor is it "self-evident."

The majority also finds fault with the "random" nature of the days chosen by GD to update their retirement forward pricing rates. *See* Majority Op. at 8. However, the ASBCA stated that GD's pricing rates "may be updated and resubmitted" in response to events such as "a significant change in benefit provisions," a "significant change in the future workforce projections," a "significant restructuring of business units or workforces," "[a]cquisitions, divestitures, plan mergers," "regulatory changes or new legislation" or "bidding on a major new contract." *Appeal of General Dynamics Corp.*, 11-2 B.C.A. ¶ 34787, 2011 WL 262447, at *7 ("ASBCA Decision"). In fact, for 2002 through 2006, the parties stipulated to the specific reasons that GD conducted intra-year valuations—reasons that had nothing to do with changes to external market conditions. J.A. 1375-77 (reasons for conducting new valuations included addition of new employees to pension plan, additions and sales of business segments, and statutory changes such as the expiration of certain provisions of the Pension Funding Equity Act of 2004). These types of events plainly do not occur at the exact same time or with the exact same frequency from year to year.

Notwithstanding this reasonable explanation and that "there is no evidence that General Dynamics self-selected a midyear date to take advantage of a short-term market change," the majority states its concern that this methodology could be used in the future to game the system. Majority Op. at 8-9. This concern, however, is unsupported by the record. The method at issue does not give GD any kind of advantage over the Government. Use of GD's method following a market slump may result, as here, in increased costs to the Government to make up for the shortfall. The inverse, however, is also (and historically has been) true: if the market booms and growth rates in

the earlier part of the year are higher than an 8% annual rate, the Government's costs will be lower. *See* ASBCA Decision at \*16 (noting range of intra-year rate growth rates above and below 8%).[4]

There is no evidence that GD's use of intra-year data results in distortions caused by short-term fluctuations. To the contrary, the record reveals that GD's method has proven more accurate.

We should not require companies to abandon decades-long practices that are compliant with the CAS for less accurate calculating methods suggested by the Government. I respectfully dissent.

---

[4]    Interestingly, the Government did not object to GD's use of intra-year fund values in its retirement plan forward pricing rate calculations during the years when the market did well and the Government was helped by GD's calculation. Additionally, the Government does not object to the use of real time updated information to calculate GD's other retirement plan forward pricing rates, including updated plan membership data, changes in benefits, new coverage, and other information.