MeHUGH, Circuit Judge,
concurring in part and dissenting in part:
I concur in the majority’s sound analysis and ultimate conclusion that Ms. Farrar has standing under Article III. However, I respectfully dissent from the majority’s conclusion regarding numerosity. As a result, I would hold that the district court abused its discretion in certifying the class. I also respectfully dissent from the court’s conclusion that Abercrombie did not violate Title III of the ADA. I would therefore affirm the injunction as it relates to the Park Meadows store but reverse the class certification order and vacate the injunction as it relates to other Hollister stores.
I. Class Certification
I agree with most of the majority’s thoughtful analysis on class certification, including the relationship of standing to class representation. But I part ways on the issue of numerosity. I would hold that at this point in the litigation, the Plaintiffs were required to present more evidence to meet their burden of establishing the nu-merosity requirement of Rule 23(a) of the Federal Rules of Civil Procedure, with respect to the class as defined.
In my view, the Plaintiffs have failed to establish facts from which a reasonable inference can be drawn as to the number of members of the defined class. Rule 23(a)(1) requires that a class be “so numerous that joinder of all members is impracticable.” While impracticability is not “a question of numbers,” Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 275 (10th Cir.1977), that is not to say that numbers are irrelevant. Indeed, the text of Rule 23(a)(1) indicates that the impracticability of joinder must be due to the class being numerous. See Fed.R.Civ.P. 23(a)(1). As the majority notes, impracticability turns on “[a] variety of factors,” such as “the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute.” See 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762, at 206-07 (3d ed.2005) (footnote omitted). But “[t]he most obvious consideration is the size of the class itself.” Id. at 177. Thus, a proper numerosity analysis should consider how the size of the class affects the practicability of joinder given “the particular circumstances of the case.” See Rex v. Owens ex rel. State of Okl., 585 F.2d 432, 436 (10th Cir.1978).
In applying this rule, the Tenth Circuit has rejected any “arbitrary limit,” Horn, 555 F.2d at 275, “set formula,” Rex, 585 F.2d at 436, or presumptive numerical threshold. Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir.2006). And proof of “absolute numbers” is unnecessary, at least in the context of injunctive or declaratory relief. Horn, 555 F.2d at 276; see also 7A Wright & Miller, supra, § 1762, at 177-84.
But this caution against a formulaic, rigid approach to impracticability does not excuse the party seeking certification from providing evidence as to the size of the particular class that has been defined. *1226 Nor does it excuse the district court from considering the impact of the size of the class on other factors in the case as • it undertakes its “ ‘rigorous analysis’ ” of the practicability of joinder. See Wal-Mart Stores, Inc. v. Dukes, — U.S. —, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). The requirements of Rule 23(a) are “stringent guidelines,” Rex, 585 F.2d at 435, and “actual, not presumed, conformance with Rule 23(a) remains ... indispensable.” General Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The composition of a class need not be readily ascertainable in a suit for injunctive or declaratory relief. Shook v. El Paso Cnty., 386 F.3d 963, 972 (10th Cir.2004); Horn, 555 F.2d at 276 (“[W]here ... the class is composed of a substantial number, no great need is present to identify each and every one.”). But even for injunctive and declaratory relief, the party seeking certification must produce “some evidence of established, ascertainable numbers constituting the class” “or otherwise establish by reasonable estimate the number of class members who may be involved” “in order to satisfy even the most liberal interpretation of the numerosity requirement.” Rex, 585 F.2d at 436 (emphasis added); William B. Rubenstein, Newberg on Class Actions § 3:13 (5th ed.) (“[A] good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable.”).
In the present case, the class is: people with disabilities who use wheelchairs and who have faced discrimination because of the presence of a raised porch at any Hollister store in the two years prior to the filing of the complaint in this case. See Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-CV-02757-WYD-KMT, 2012 WL 1378531, at *1 (D.Colo. Apr. 20, 2012) (defining the class at hand). Although the remedy requested in this case is injunctive relief, it is brought on behalf of a relatively narrow group of class members. Only those persons using wheelchairs who suffered past discrimination as a result of the raised porches, and only the subset of that group who were deterred by the raised porches within the two years immediately preceding the filing of the complaint in this action. In my view, the Plaintiffs have not offered any evidence from which even a reasonable estimate of the number of members of this class can be made.[1]
Furthermore, requiring some evidence of class size is consistent with the Supreme Court’s characterization of the burden Rule 23(a) places on the proponent of a class:
Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.
Wal-Mart Stores, 131 S.Ct. at 2551 (emphasis in original); see also Trevizo, 455 F.3d at 1162 (referring to the burden as “a strict burden of proof’ (internal quotation marks omitted)). Thus, “mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1).” 7A Wright & Miller, supra, § 1762, at 181-84; accord Rubenstein, supra, § 3:13. Rather *1227 than proceeding based on such speculation, we have required in other contexts that when facts are established by inferences drawn by the finder of fact, such inferences must be based on evidence. Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521-22 (10th Cir.1987). Therefore, “a plaintiff must show enough evidence of the class’s size to enable the court to make commonsense assumptions regarding the number of putative class members.” Rubenstein, supra, § 3:13.[2]
Here, I would conclude that the Plaintiffs did not provide the district court with enough to make commonsense assumptions about the size of the defined class. The majority finds numerosity to be established because “porches were present at nearly 250 Hollister stores in over 40 states,” “CCDC submitted declarations from five of its members who averred that they shop at malls where Hollister stores are located,” and “there are millions of Americans with disabilities.” Maj. Op. at 1215. The first fact is relevant to “the location of the ... subject matter of the dispute.” 7A Wright & Miller, supra, § 1762, at 206-07. This fact certainly pertains to the issue of impracticability, but by itself it does nothing to establish the size or even the existence of a class. The second fact — declarations submitted by five CCDC members — is problematic in establishing the size of a class because each of these five members was a named party to the present litigation, presented to the district court as proposed class representatives. I Aplt.App. 148, 158. “[I]f there are no members of the class other than the named representatives, then Rule 23(a)(1) obviously has not been satisfied.” 7A Wright & Miller, supra, § 1762, at 171-72. Although four of the five CCDC members withdrew from the litigation, the declarations do little by themselves to provide a reasonable estimate of the size of the class.[3] I would reach the same conclusion even if the record evidence is supplemented on appeal by public census data, of which the Plaintiffs ask us to take judicial notice.
In my view, the relevant numerosity inquiry here is whether reasonable inferences can be drawn from the five declarations in combination with the census data to provide a reasonable estimate of the size of the class. Relying on the census data, the Plaintiffs note that in 2010, “approximately 1.5 percent of the population or 3.6 million people nationwide used wheelchairs for mobility,” and that the *1228 percentage of people who use wheelchairs in each state is similar according to the most recent data. Aplee. Br. 39-40. Even if I were to delve deeper into the census data than the Plaintiffs have done in their briefing to this court and estimate the number of people who use wheelchairs in states that have Hollister stores with porches, that number does not provide a reasonable estimate of the number of persons who use wheelchairs and who have faced discrimination because of the presence of a raised porch at any Hollister store during the relevant two-year period. See Colo. Cross-Disability Coal., No. 09-CV-02757-WYD-KMT, 2012 WL 1378531, at *1.[4] Simply put, nothing about the raw numbers provides a basis for estimating how many people who use wheelchairs were actually discriminated against at a Hollister store during the identified two years due to its raised porches. Furthermore, that number cannot be extrapolated because Plaintiffs have provided no evidence that the five CCDC members are indicative of people who use wheelchairs in Colorado and the other states that have Hollister stores with porches. Indeed, in its memorandum in opposition to the motion to certify, Abercrombie pointed to deposition testimony suggesting that at least two of the five CCDC members were sent to Hollister stores to test for compliance. II ApltApp. 492. Where these CCDC members were recruited to visit Hollister stores, they provide little help in extrapolating the possible number of people who use wheelchairs and who have shopped at Hollister stores in other states.[5]
Admittedly, we grant the district court “wide latitude” in making the numerosity determination. Trevizo, 455 F.3d at 1162. But we do so “because it is ... a fact-specific inquiry,” id., and therefore implicates the district court’s discretion to make rational inferences from that evidence. Vallario v. Vandehey, 554 F.3d 1259, 1264 (10th Cir.2009). But such inferences must be based on evidence. See Sunward Corp., 811 F.2d at 521-22; cf. Rex, 585 F.2d at 436 (stating that party seeking certification must produce “some evidence”). Here, the Plaintiffs did not provide any evidence of established, ascertainable numbers or otherwise establish by reasonable estimate the number of persons using wheelchairs who have been discriminated against by the presence of Hollis-ter’s raised porches within the relevant two-year period. See Rex, 585 F.2d at 436 (concluding that the district court did not abuse its discretion in refusing to certify a class seeking injunctive and declaratory relief when the plaintiff presented no evidence of the size of the class).
Instead, the Plaintiffs proved a class size of anywhere from five members to 3.6 million members, which does not constitute a reasonable estimate. While commonsense assumptions and reasonable inferences can help narrow that range, the Plaintiffs failed to provide any evidence from which a reasonable estimate of the *1229 number of class members may be deduced. This does not meet the admittedly low threshold required for certification of a class seeking injunctive relief. To hold otherwise would eviscerate the numerosity requirement in Rule 23(a) and run contrary to the Supreme Court’s admonition that the proponent of a class must “affirmatively demonstrate his compliance with the Rule.” See Wal-Mart Stores, 131 S.Ct. at 2551. As a result, I would hold the district court’s ruling amounted to a “[m]a-terial misapplication of the Rule 23 factors.” See Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213, 1217 (10th Cir.2013) (concluding that the district court abused its discretion by, among other things, relaxing the burden of proof under Rule 23(a)). I would therefore .reverse the certification order.
II. ADA Violation
Because I would reverse the certification order, I address the merits of the case only as it relates to the Park Meadows store. Unlike the majority, I would hold that Abercrombie violated Title III of the ADA in two respects. First, I would conclude that the porch is a space that is required to be accessible and thus violates the ADA by not being connected to an accessible route. Second, I would conclude that Abercrombie’s use of the porch violates the ADA by denying customers who use wheelchairs the opportunity to participate and instead providing them a separate, unequal, non-integrated benefit.
“Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals.” PGA Tour, Inc. v. Martin, 532 U.S. 661, 674, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). “In studying the need for such legislation, Congress found that ‘historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.’ ” Id. at 674-75, 121 S.Ct. 1879 (quoting 42 U.S.C. § 12101(a)(2)). Congress also found that “individuals with disabilities continually encounter various forms of discrimination, including ... the discriminatory effects of architectural ... barriers.” 42 U.S.C. § 12101(a)(5). “After thoroughly investigating the problem, Congress concluded that there was a compelling need for a clear and comprehensive national mandate to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.” PGA Tour, 532 U.S. at 675, 121 S.Ct. 1879 (internal quotation marks omitted). “In the ADA, Congress provided that broad mandate.” Id. Twelve years after Congress passed the ADA, Abercrombie opened a store in the Park Meadows Mall designed with a distinctive area open to the public but accessible only to ambulatory persons, thereby relegating patrons who use wheelchairs to non-integrated, second-class areas. I believe the ADA and the regulations promulgated under it prohibit this conduct.
A. Spaces, Entrances, & Routes
My disagreement with the majority is simple. As the majority reads the guidelines, spaces in a newly constructed facility need not be accessible unless a specific standard directly requires as much. As I read the guidelines, all spaces in a newly constructed facility must be accessible unless specifically exempted. Both the 1991 and 2010 Design Standards require all non-exempted spaces to be connected by an accessible route. Accessible routes cannot have stairs. I would conclude that the porch at issue here is a non-exempt space that is not on an accessible route and that Abercrombie has therefore violat *1230 ed the ADA by designing and constructing a non-compliant facility.
a. All spaces are required to comply with the regulations unless otherwise exempted.
The 1991 Design Standards begin with the general requirement that all non-exempt areas must comply with the guidelines:
All areas of newly designed or newly constructed buildings and facilities required to be accessible by 4.1.2 and 4.1.3 and altered portions of existing buildings and facilities required to be accessible by 4.1.6 shall comply with these guidelines, 4.1 through 4.35, unless otherwise provided in this section or as modified in a special application section.
1991 Standard 4.1.1(1); accord 2010 Standards 201.1, 203.1. The phrase “required to be accessible by 4.1.2 and 4.1.3” could be read as modifying either “All areas” or “newly designed or newly constructed buildings and facilities.” If read to modify “All areas,” as the majority does, the rule reads as follows:
All areas ... required to be accessible by 4.1.2 and 4.1.3 and ... 4.1.6 shall comply with these guidelines, 4.1 through 4.35, unless otherwise provided in this section or as modified in a special application section.
1991 Standard 4.1.1(1). As the majority notes, the Design Standards define “accessible” as “[d]escrib[ing] a site, building, facility, or portion thereof that complies with these guidelines.” Id. 3.5; accord 2010 Standard 106.5. The majority correctly states that nothing in standards 4.1.2, 4.1.3, and presumably 4.1.6 expressly requires all spaces to comply with the guidelines. Unlike the majority, I am convinced that overarching requirement is present in standard 4.1.1(1) itself.
When the phrase in section 41.1(1), “required to be accessible by 4.1.2 and 4.1.3,” is read to modify “newly designed or newly constructed buildings and facilities,” the meaning becomes clear:
All areas of newly designed or newly constructed buildings and facilities ... shall comply with these guidelines, 4.1 through 4.35, unless otherwise provided in this section or as modified in a special application section.
Id. Under this reading, if a new building is subject to the requirements of 4.1.2 or 4.1.3, then all areas of that building must also comply with the guidelines, unless otherwise provided.[6] The propriety of this reading — that all areas must comply unless exempted — is reinforced by the explicit statement in standard 4.1.1 that certain “non-occupiable spaces ... frequented only by service personnel for repair purposes” are not required to comply with the guidelines. 1991 Standard 4.1.1(5)(b)(ii). If spaces were never required to comply with the guidelines in the first instance, there would be no reason to exempt certain types of spaces.
This reading is also reinforced by the clarification of this provision in the 2010 Design Standards and its elaboration on the list of exceptions. The 2010 standards remove the confusing language and state, “All areas of newly designed and newly constructed buildings and facilities and altered portions of existing buildings and facilities shall comply with these requirements.” 2010 Standard 201.1 (emphasis *1231 added). Thus, the 2010 Design Standards leave no doubt that all areas of newly constructed buildings must comply.[7] The new standards further state, “Sites, buildings, facilities, and elements are exempt from these requirements to the extent specified by 203.” Id. 203.1 (emphasis added). Although standard 203.1 does not list “spaces” generally as exempt, the enumerated list of exceptions includes several areas specifically identified as “spaces,” such as “limited access spaces” and “machinery spaces.” See, e.g., 2010 Standards 203.4, 203.5. Again, the exemption of certain types of spaces supports a reading in which all spaces are otherwise subject to the guidelines.
I am convinced this interpretation is the correct reading of the 1991 standards. But at the very least, standard 4.1.1(1) is ambiguous. When a regulation is ambiguous, we must defer to the agency’s interpretation of its own regulations, even in an amicus brief. Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); see also Christensen v. Harris Cnty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Ambiguity exists when “[n]o statute or regulation squarely addresses” the issue. See Talk Am., Inc. v. Michigan Bell Tel. Co., — U.S. —, 131 S.Ct. 2254, 2260-61, 180 L.Ed.2d 96 (2011). Therefore, I would defer to the Department of Justice’s interpretation of the Design Standards: all non-exempt areas must comply with the guidelines.
If all “areas” must comply, a “space” must comply. This is because the Design Standards define “space” as a “definable area.” 1991 Standard 3.5 (emphasis added). Thus, when the Design Standards state that all “areas” must comply with the guidelines unless exempted, I would conclude this requires all non-exempt “spaces” to comply. I do not share the majority’s concern about “the expansive definition of ‘space’” in the Design Standards. Maj. Op. at 1221-22. Although “definable area” could be read expansively, the enumerated list of spaces places a limit on that definition. “[T]he commonsense canon of nosci-tur a sociis ... counsels that a word is given more precise content by the neighboring words with which it is associated.” Freeman v. Quicken Loans, Inc., — U.S. —, 132 S.Ct. 2034, 2042, 182 L.Ed.2d 955 (2012). Thus, a “space” must not only be a definable area, but it must be a definable area in the same manner as a “room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby.” See 1991 Standard 3.5; accord 2010 Standard 106.5.
The raised porch at issue is a “space.” Indeed, the majority concludes that the porch is an entrance, separate from the two entrances flanking the porch. See Maj. Op. at 1223-24; see also 1991 Standard 3.5 (defining entrance); accord 2010 Standard 106.5 (same). As an “entrance,” the porch would expressly fall within the definition of a “space.” But as discussed more fully below, I would conclude that the porch is not just an entrance. It is also an area that is definable in the same sense as a room or lobby. See 1991 Standard 3.5; 2010 Standard 106.5. However, I agree with the majority that concluding the porch is a space does not end the inquiry. We must next determine whether the space is exempt from compliance with the guidelines. I would conclude that it is not. The porch is a non-exempt space that *1232 is required to be connected to an accessible route. As described below, it was not connected to an accessible route and, therefore, does not meet either the 1991 or 2010 Design Standards.
b. The porch does not comply with the ADA under the 1991 Design Standards.
To determine whether a space complies with the Design Standards, I would look first to any general exceptions. I would then look to the specific requirements for the type of space involved to determine what compliance entails and whether the specific standards contain any relevant exceptions.
Under the 1991 Design Standards, section 4. 1.1 provides a list of spaces and other areas that are exempt from the guidelines:
Accessibility is not required to (i) observation galleries used primarily for security purposes; or (ii) in non-oceupiable spaces accessed only by ladders, catwalks, crawl spaces, very narrow passageways, or freight (non-passenger) elevators, and frequented only by service personnel for repair purposes; such spaces include, but are not limited to, elevator pits, elevator penthouses, piping or equipment catwalks.
1991 Standard 4.1.1(5)(b).[8] In the present case, deposition testimony, photographic evidence, and architectural drawings all establish that the porch is neither an observation gallery used primarily for security purposes nor a non-occupiable space accessed only by ladders, etc., and frequented only by service personnel for repair purposes. Thus, this general exception does not exempt the porch from the requirement that it comply with the regulations and Abercrombie does not argue otherwise.
Nor, in my view, is the porch exempt as an entrance under the 1991 Design Standards. The 1991 Design Standards state, “At least 50% of all public entrances ... must be accessible.” Id. 4.1.3(8)(a)(I). The negative inference of standard 4.1.3(8) is that half of all public entrances need not comply with the guidelines. However, the standard further provides, “Where feasible, accessible entrances shall be the entrances used by the majority of people visiting or working in the building.” Id. 4.1.3(8)(a).
The majority concludes that no evidence was presented from which the district court could infer that the porch was used by a majority of people visiting or working in the Park Meadows Hollister. I disagree. Unlike the lack of evidence supporting the district court’s inference as to class size, the record contains deposition testimony, declarations, photographic evidence, and architectural drawings that all support a reasonable inference that a majority of people use the porch entrance at the Park Meadows Hollister. The four CCDC members who are no longer named parties in this litigation submitted declarations stating that the side entrances were difficult to find and “looked like shutters ... indistinguishable from the rest of the shutters on the exterior of the store.” I Aplt.App. 118, 121, 123-24, 126-27. The side entrances have since been modified to make them more visible. Ill Aplt.App. 734-36. But Ms. Farrar did not see the two side entrances at the Park Meadows Hollister after the modifications took place, id.; II Aplt.App. 462, 657, though *1233 she admittedly did not continue to look for accessible entrances after being deterred by the porch, II Aplt.App. 462, 657-59.
The inference that the porch was the entrance used by the majority of visitors is also supported by Abercrombie’s own actions. Indeed, it was not until after this litigation began that Abercrombie directed store managers to unlock the side entrances when opening the store. Ill Aplt. App. 734. And Abercrombie representatives declared that the porch was designed to draw customers into the store. Ill ApltApp. 732-83. Tellingly, Abercrombie submitted a declaration stating that roping off the porch entrance “would be confusing to customers” and would cause “immense and unquantifiable loss in sales and revenue.” Ill ApltApp. 1071.
In my view, this evidence combined with the photographs and architectural drawings illustrate that the porch is the focal point of the storefront, with trees, decorations, upholstered chairs, mannequins displaying merchandise, and a large marketing image on the back wall. I ApltApp. 298-302; Aplee. Br. 7. Furthermore, the photographs of the Park Meadows Hollis-ter storefront depict a large pillar blocking one’s view of the side entrance into the “Bettys” section of the store.[9] I ApltApp. 298-302. I would hold that it is a small and imminently reasonable step to infer from this evidence that a majority of people use the porch to enter the Park Meadows Hollister. And because Abercrombie has identified no contrary evidence to support a reasonable inference that a majority of people do not use the porch to enter the store, no genuine dispute of material fact exists on this point.[10]
Because a majority of people use the porch entrance, the porch entrance was required to be “accessible.” 1991 Standard 4.1.3(8)(a). As an “accessible entrance,” the porch was required to be on an “accessible route”:
Entrances required to be accessible by 4.1 shall be part of an accessible route complying with 4.3_They shall also be connected by an accessible route to all accessible spaces or elements within the building or facility.
Id. 4.14.1; see also id. 4.1.3(1) (“At least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility.”); id. 4.3.2(2) (“At least one accessible route shall connect accessible buildings, facilities, elements, and spaces that are on the same site.”); id. 4.3.2(3) (“At least one accessible route shall connect accessible building or facility entrances with all accessible spaces and elements and with all accessible dwelling units within the building or facility.”). An “accessible route” is a “continuous unobstructed path connecting all accessible elements and spaces of a building or facility” that “may include corridors, floors, ramps, elevators, lifts, and clear floor space at fixtures.” Id. 3.5. Of particular relevance here, “[a]n accessible route does not include stairs, steps, or escalators.” Id. 4.3.8 (emphases added). Because it was accessible only by stairs, the porch was not connected to an accessible route. Therefore, it violates the 1991 Design Standards.
The porch also violates the 1991 Design Standards as a space in other respects. The majority concludes that because the *1234 porch is an entrance, the porch need only comply with guidelines relating to entrances. But as I indicated above, the porch is not just an entrance. Abercrom-bie submitted declarations and deposition testimony to the district court characterizing the porch as a “display area.” See III Aplt.App. 738, 968, 971-72. One Aber-crombie official explained, “It’s not really an entrance, it’s more of a display area.” Ill ApltApp. 968. Another stated that the porch is “used as a visual display analogous to a store window in another retail store.” Ill ApltApp. 971-72; see also id. at 738. The record also establishes that the porch is a definable area much like a room or lobby, III ApltApp. 908-09, which functions as a customer lounge and as a distinct marketing space, designed to draw customers into the store and strengthen the Hollister brand and image. Id. at 732-33.
Where a space has multiple uses, each portion of the space must comply with the requirements applicable to that use. See Caruso v. Blockbuster-Sony Music Entm’t Ctr. at the Waterfront, 193 F.3d 730, 737-38 (3d Cir.1999) (Alito, J.) (holding that an assembly area was required to be on an accessible route because all “accessible spaces” are required to be on an accessible route, “regardless of whether or not the facility [was] also required to meet the more specific DOJ Standards concerning fixed seating plans” for assembly areas); cf. 1991 Standard 41.1(2) (“When a building or facility contains more than one use covered by a special application section, each portion shall comply with the requirements for that use.”);[11] Talk Am., 131 S.Ct. at 2265 & n. 6 (stating under a different regulatory scheme that when telephone wires and cables can be used for different functions, “regulatory treatment can vary depending on [their] use”).
The 1991 Design Standards do not have any provisions directed specifically at display areas or customer lounges. But in each of these ways, the porch is a space— i.e., a definable area in the same manner as a room or lobby. As with non-exempt entrances, all non-exempt spaces are required to be on an accessible route. 1991 Standard 41.2(2) (“At least one accessible route complying with 4.3 shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site.”); id. 4.43(1) (“At least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility.”); id. 4.3.2(3) (“At least one accessible route shall connect accessible building or facility entrances with all accessible spaces and elements and with all accessible dwelling units within the building or facility.”).
Having determined that the porch is a space that functions as a display area and customer lounge, and, therefore, is generally covered by the guidelines, I next consider whether it falls within an exception. Some display areas may qualify as a “space” while also being exempted by the exceptions for employee work areas. Standard 4.41(3) places limits on the requirements for “[a]reas that are used only as work areas.” Id. 4.41(3). But the porch does not qualify as an exempt work area because it is open to customers, see id., and I am aware of no other exception *1235 that would exempt this space from compliance with the Design Standards.
In summary, the Design Standards contain an overarching requirement that all areas — including spaces — must comply with the guidelines. In turn, the guidelines require that all non-exempt spaces be on an accessible route. Unlike the majority, I would conclude that the porch is a non-exempt entrance which must comply with the 1991 Design Standards. But even if the majority is correct that the standards governing entrances exempt the porch from the accessible route provisions as an entrance, the accessible route provisions are equally applicable to the porch as a definable area like a room or lobby, which is used as a display area and customer lounge. Thus, I would hold that the porch does not comply with the 1991 Design Standards because it is not on an accessible route.
As the majority explains, any injunctive relief based on the violation of the 1991 standards would require compliance with the 2010 Design Standards. If those newer standards exempt the porch from being on an accessible route, then, as the majority notes, Abercrombie effectively will be deemed to be in compliance. I am convinced that the 2010 Design Standards also require the porch to be on an accessible route as a display area and customer lounge. Thus, even if the porch is an exempt entrance under the 2010 Design Standards, it must be on an accessible route.
c. To be brought into compliance with the 2010 Design Standards, the porch must be on an accessible route.
I agree with the majority that because the majority-use requirement was removed from the 2010 Design Standards, the standards governing entrances no longer require the porch, as an entrance, to be on an accessible route. But the standards governing spaces used for purposes other than entrances have not changed. Therefore, I would hold that the porch must be on an accessible route to be brought into compliance with the 2010 Design Standards.
As a definable area similar to a room or lobby, the porch is a space and is not exempt under any general exceptions. The 2010 Design Standards expanded and elaborated upon the list of exceptions contained in the 1991 Design Standards. Exceptions addressing spaces in the 2010 Design Standards include “[ajreas raised primarily for purposes of security, life safety, or fire safety,” 2010 Standard 203.3; “[sjpaces accessed only by ladders, catwalks, crawl spaces, or very narrow passageways,” id. 203.4; “[sjpaces frequented only by service personnel for maintenance, repair, or occasional monitoring of equipment,” id. 203.5; and certain employee work areas. Id. 203.9. All such spaces “shall not be required to comply with these requirements or to be on an accessible route.” Id. 203 (emphasis added). The porch, which is used as a display area and customer lounge, does not fall into any of these general exceptions.
Nor does any more specific exception exempt the porch from complying with the accessible roúte requirement in this context. Because the area qualifies as a “space,” as discussed above, it is required to be on an accessible route unless exempted by some other provision. See id. 201.1, 203.1, 206.2.2, 206.2.4. As with the 1991 Design Standards, a space may be exempt as an employee work area, see id. 203.9, but the 2010 Design Standards define an “employee work area” as “[ajll or any portion of a space used only by employees and used only for work.” Id. 106.5. The porch *1236 is not exempted because it is open to customers and is not used only for employee work. Thus, I would hold that the porch is a non-exempt space and must be on an accessible route. Id. 206.2.2, 206.2.4.
To the extent there is any ambiguity in what the regulations require, placing the porch on an accessible route is “consistent with the ADA’s purpose of enabling people with disabilities to share equally in the benefits provided by a public accommodation.” Caruso, 193 F.3d at 733. It is also consistent with the interpretation advanced by the Department of Justice, which is entitled to deference. Auer, 519 U.S. at 462, 117 S.Ct. 905.
Thus, as with the 1991 Design Standards, even if the provisions governing entrances in the 2010 Design Standards exempt the porch from complying with the accessible route provisions as an entrance, the accessible route provisions apply to the porch as a display area and customer lounge. See 2010 Standard 201.2 (“Where a site, building, facility, room, or space contains more than one use, each portion shall comply with the applicable requirements for that use.”). While the doors at the end of the porch are exempt and thus need not be on an accessible route, the porch itself must be connected to at least one accessible route. More simply, although Abercrombie may design its stores to provide access to the interior of the store through the side doors, it cannot deprive the wheelchair-using public from complete access to the distinct space that is the porch.
B. Denial of Participation, Separate & Unequal Benefit & Integration
I agree with the majority that we must look to the Design Standards to determine whether a defendant has discriminated in the design, construction, or alteration of a facility, but that discrimination in the use of a facility is controlled by other regulatory and statutory provisions.[12] But nothing prohibits the Plaintiffs from arguing — as they have both below and on appeal — that Abercrombie has discriminated both in terms of design and use of the facility. Abercrombie uses the space as a distinct branding tool, display area, and customer lounge that is not accessible to people who use wheelchairs. I would hold that this use qualifies as “discrimination” within the meaning of Title III of the ADA.
Title III of the ADA contains a list of general activities that it defines as discrimination: the denial of an opportunity to participate, 42 U.S.C. §§ 12182(b)(l)(A)(i), 12182(b)(1)(C); the provision of an unequal benefit, id. § 12182(b)(1)(A)(ii); and the provision of a separate benefit, unless doing so is necessary to provide a benefit that is as effective as that provided to others. Id. § 12182(b)(l)(A)(iii).[13] Furthermore, the statute requires benefits provided to people with disabilities to be afforded in the most integrated setting appropriate to the needs of the individual. Id. § 12182(b)(1)(B).
*1237 I would hold that Abercrombie’s use of the porch violates each of these provisions. As the preceding discussion indicates, I disagree with the majority’s conclusion that “Abercrombie does not ‘use’ the porch at all.” Maj. Op. at 1219. Abercrombie uses the space as an entrance, customer lounge, and display area, decorated in a fashion calculated to draw customers into the store and strengthen the Hollister brand and image. During the litigation, Abercrombie made much of the fact that the porch was intended as a visual display only, and that the “visual sensory experience of the porch is the same for able-bodied customers and customers who use mobility devices.” Ill Aplt.App. 738, 940-41, 972; see also Aplt. Br. 45-46. Yet when presented with the option of bringing the porch into compliance by closing it off to all customers, Abercrombie submitted a declaration stating that this was the “worst, and least acceptable” of the options presented by the district court because it would “be extremely detrimental to the Company’s carefully crafted branding efforts” and would “cause permanent damage to the Hollister brand.” Ill ApltApp. 1071. Abercrombie’s response belies its assertion that the use of the porch as a customer lounge, branding tool, and display area provides merely a visual sensory experience that all customers can enjoy equally, even without access to the porch.
By placing trees, decorations, upholstered chairs, mannequins displaying merchandise, and a large marketing image on the back wall of the porch entrance, Aber-crombie has provided a “facility, privilege, advantage, or accommodation” to some of its customers while denying some customers the opportunity to participate on the basis of their disability. 42 U.S.C. § 12182(b)(l)(A)(i).[14] The effect is to create a benefit for some customers that is denied to others on the basis of disability. By requiring customers who are unable to use stairs to enter the store through entrances that are not adorned or used even remotely like the porch entrance, Aber-crombie has afforded a “facility ... or accommodation that is not equal to that afforded to other individuals,” id. § 12182(b)(l)(A)(ii),[15] and that is “different or separate from that provided to other individuals.” Id. § 12182(b)(l)(A)(iii).[16] Finally, Abercrombie’s use of this exclusive entrance as a customer lounge, branding tool, and display area, combined with Abercrombie’s provision of segregated, inferior accessible entrances, violates the ADA’s mandate to provide facilities and accommodations “in the most integrated setting appropriate to the needs of the *1238 individual.” Id. § 12182(b)(1)(B).[17] The integration mandate “prohibit[s] exclusion and segregation of individuals with disabilities.” 28 C.F.R. § 36, App. C, at 901 (agency guidance on Title Ill’s integration mandate). By excluding customers who use wheelchairs from the porch and requiring them to use the unadorned, inferi- or side entrances, Abercrombie effectively “relegates persons with disabilities to the status of second-class citizens.” See id. Thus, Abercrombie’s use of the porch violates Title III of the ADA.[18]
My conclusion that Abercrombie is in violation of the general provisions of the ADA reinforces my conclusion that Aber-crombie violated the Design Standards by not connecting the porch to an accessible route. The specific prohibitions in the ADA must be read in light of the general prohibitions. See Caruso, 193 F.3d at 739-40. The general prohibitions make clear that the purpose of the ADA is inclusion of people with disabilities. The porch at the Park Meadows Hollister sends a message of exclusion. Construing the Design Standards in a way that allows that result would undermine the stated purpose of Title III of the ADA.
In light of the foregoing, I would affirm the district court’s entry of summary judgment in favor of the Plaintiffs, and its entry of an injunction relating to the Park Meadows store.[19]
*1239 ATTACHMENT 1
[[Image here]]
*1240 ATTACHMENT 2
[[Image here]]

. Although meeting the numerosity requirement as I interpret it requires some effort on the part of a proponent of a class, CCDC has demonstrated in other litigation that as a general matter, it is capable of meeting this burden. See Colo. Cross-Disability Coal. v. Taco Bell Corp., 184 F.R.D. 354, 358 (D.Colo.1999) (finding a potential class that "may include more than 2,000 people” based on census data and survey results provided by CCDC demonstrating that 14.5% of the 200 people who responded fit the class definition).

. In Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270 (10th Cir.1977), we acknowledged that other courts have stated that "where the relief sought is injunctive and declaratory, even speculative and conclusory representations as to the size of the class are sufficient.” Id. at 275-76 (citing Doe v. Flowers, 364 F.Supp. 953, 954 (N.D.W.Va.1973) (three-judge panel) (per curiam), aff'd mem., 416 U.S. 922, 94 S.Ct. 1921, 40 L.Ed.2d 279 (1974)). Although the Fourth Circuit has relied on this statement, it has not excused parties from first establishing the existence of the class. See Doe v. Charleston Area Med. Ctr., Inc., 529 F.2d 638, 645 (4th Cir.1975). To the extent Horn approved of the statement that speculative and conclusory representations are sufficient, it was not necessary to the holding in Horn because that case involved a class of specified size. See 555 F.2d at 275-76 (concluding that the district court abused its discretion because it became "stymied by the concept of very large numbers” and ignored other factors relevant to impracticability). Furthermore, relying on speculative and conclusoiy representations is inconsistent with later Supreme Court and Tenth Circuit precedent. See Wal-Mart Stores, Inc. v. Dukes, - U.S. -, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011); DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1194 (10th Cir.2010); Rex v. Owens ex rel. State of Okl, 585 F.2d 432, 436 (10th Cir.1978).

. The Plaintiffs did not rely on the five declarations to establish numerosity below, nor have they done so on appeal.

. Although no party has raised the issue, I am also troubled by the fact that the class seeking injunctive relief is defined solely in terms of past injury. Such disjunction between the relief sought and the injuries alleged by the class does not present a problem of standing or class certification. Devaughn, 594 F.3d at 1197-98. Rather, it presents a problem of whether the class is entitled to injunctive relief. Lewis v. Casey, 518 U.S. 343, 359-60 & n. 7, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

. It is not their status as testers that is problematic in extrapolating the size of the class based on these plaintiffs; rather, it is the fact that they may not have fallen within the definition of the class without having been recruited by CCDC for this litigation. This undermines the reasonableness of using such plaintiffs as statistically representative of the number of people who fall within the class definition in other states.

. When the Standards say the areas must comply with the guidelines, that means the areas must be accessible. 1991 Standard 3.5 (Accessible means "a site, building, facility, or portion thereof that complies with these guidelines.”). Compare 4.1.3(19) (requiring assembly areas to comply with 4.33), with 4.33.1 ("Assembly and associated areas required to be accessible by 4.1 shall comply with 4.33”).

. The Department of Justice’s Analysis and Commentary on the 2010 ADA Standards for Accessible Design discusses “selected substantive changes” between the 1991 Design Standards and the 2010 Design Standards. 28 C.F.R. Pt. 36, App. B at 829. The commentary does not address "[e]ditorial changes.” Id. With respect to the amendment reflected in standard 201.1, the commentary is silent.

. Standard 4.1.1 also contains an exception for structural impracticability. 1991 Standard 4.1.1(5)(a). Abercrombie has not argued that the porch is exempt from compliance on this basis.

. See photograph attached at the end of this decision as Attachment 1.

. Although Abercrombie has challenged whether CCDC adequately proved the porch is the entrance used by the majority of customers, it has never suggested or offered any evidence that the porch, in fact, is not the main entrance to the store.

. The 1991 Design Standards phrase the principle in terms specific to "special application sections.”. But the 2010 Design Standards clarify that the principle applies generally as well: "Where a site, building, facility, room, or space contains more than one use, each portion shall comply with the applicable requirements for that use.” 2010 Standard 201.2.

. “Use” of a facility may be relevant to determining which design standards apply. In this sense, it is not a defendant’s use of a facility that is discriminatory; rather, the defendant’s use may give rise to an obligation to design the facility in a certain way. But "use” of a facility may also be relevant in that a defendant’s use may itself be discriminatory if the defendant’s (in)actions violate the more general statutory or regulatory provisions of the ADA. See 42 U.S.C. § 12182(b)(1).

. These provisions are limited to discrimination against "clients or customers.” 42 U.S.C. § 12182(b)(l)(A)(iv). I would hold that the Plaintiffs have established at the summary judgment stage that Ms. Farrar is a customer.

. Subsection 12182(b)(1 )(A)(i) provides, "It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.”

. Subsection 12182(b)(l)(A)(ii) provides, "It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.”

.Subsection 12182(b)(l)(A)(iii) provides, "It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.”

. Subsection 12182(b)(1)(B) provides, "Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.”

. Compliance with the design standards would not have been difficult. In fact, Aber-crombie designed some of its stores with the same surf-shack motif, but in an inclusive fashion, by simply constructing the porch at ground level. A picture of a store with that design is attached to this decision as Attachment 2.

.Because I would hold that Abercrombie violated the ADA, I would also address an aspect of Abercrombie’s appeal unnecessary to the majority's analysis: namely, whether the district court abused its discretion in fashioning the injunctive relief granted. I would hold that where the district court was required to issue an injunction and tailored that injunction to accommodate many of the concerns raised by Abercrombie, the district court did not abuse its discretion.?