(Slip Opinion)	OCTOBER TERM, 2011	1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FREEMAN ET AL. *v.* QUICKEN LOANS, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 10–1042.   Argued February 21, 2012—Decided May 24, 2012

The Real Estate Settlement Procedures Act (RESPA), provides, as relevant here, that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed."  12 U. S. C. §2607(b).  Petitioners, three couples who obtained mortgage loans from respondent, filed separate state-court actions, alleging that respondent had violated §2607(b) by charging them fees for which no services were provided in return.  After the cases were removed to federal court and consolidated, respondent sought summary judgment, arguing that petitioners' claims were not cognizable under §2607(b) because the allegedly unearned fees were not split with another party.  The District Court agreed; and because petitioners had not alleged any splitting of fees, it granted respondent summary judgment.  The Fifth Circuit affirmed.

*Held*: In order to establish a violation of §2607(b), a plaintiff must demonstrate that a charge for settlement services was divided between two or more persons.  Pp. 3–13.

   (a) Section 2607(b) unambiguously covers only a settlement-service provider's splitting of a fee with one or more other persons; it cannot be understood to reach a single provider's retention of an unearned fee.  Pp. 3–11.

      (1) Section 2607(b) clearly describes two distinct exchanges. First, a "charge" is "made" to or "received" from a consumer by a settlement-service provider.  That provider then "give[s]," and another person "accept[s]," a "portion, split, or percentage" of the charge. Congress's use of different sets of verbs, with distinct tenses, to distinguish between the consumer-provider transaction and the fee-sharing one would be pointless if, as petitioners contend, the two

Syllabus

transactions could be collapsed into one. Their reading—that a settlement-service provider can "make" a charge and then "accept" the portion of the charge consisting of 100 percent—does not avoid collapsing the sequential relationship of the two stages and would destroy the tandem character of activities that the text envisions at stage two (*i.e.,* a giving and accepting). And if the consumer were the person who "give[s]" a "portion, split, or percentage" of the charge to the provider who "accepts" it, consumers would become lawbreakers themselves. Pp. 3–8.

(2) The normal usage of the terms "portion," "split," and "percentage"—which, when referring to a portion or percentage of a whole, usually mean less than 100 percent—reinforces the conclusion that §2607(b) does not apply where a settlement-service provider retains the entirety of a fee received from a consumer. The meaning is also confirmed by the "commonsense canon of *noscitur a sociis,* which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States* v. *Williams*, 553 U. S. 285, 294. This connation is not undermined by the canon against surplusage. "Portion," "split," and "percentage" may all mean the same thing, but the canon merely favors that interpretation which avoids surplusage, see *Microsoft Corp.* v. *i4i Ltd. Partnership*, 564 U. S. ___, ___, and petitioners' interpretation no more achieves that end than the Court's does. Pp. 8–11.

(b) Petitioners' arguments in favor of their contrary interpretation are unpersuasive. Section 2607(b), as interpreted here, is not rendered surplusage by §2607(a)'s express prohibition of kickbacks, for each subsection reaches conduct that the other does not. RESPA's general purpose—to protect consumers from "certain abusive practices," §2601(a)—also provides no warrant for expanding §2607(b)'s prohibition beyond the field to which it is unambiguously limited: the splitting of fees paid for settlement services. And giving §2607(b) its natural meaning would not lead to absurd results. Pp. 11–13.

626 F. 3d 799, affirmed.

SCALIA, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 10–1042

————

## TAMMY FORET FREEMAN, ET AL., PETITIONERS *v.* QUICKEN LOANS, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 24, 2012]

JUSTICE SCALIA delivered the opinion of the Court.

A provision of the Real Estate Settlement Procedures Act (RESPA), codified at 12 U. S. C. §2607(b), prohibits giving and accepting "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." We consider whether, to establish a violation of §2607(b),[1] a plaintiff must demonstrate that a charge was divided between two or more persons.

I

Enacted in 1974, RESPA regulates the market for real estate "settlement services," a term defined by statute to include "any service provided in connection with a real estate settlement," such as "title searches, . . . title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, . . . services rendered by a real estate agent or broker, the origination of a federally re-

————

[1] This and all subsequent section references pertain to Title 12 unless otherwise specified.

lated mortgage loan[2] . . . , and the handling of the pro-
cessing, and closing or settlement." §2602(3). Among
RESPA's consumer-protection provisions is §2607, which
directly furthers Congress's stated goal of "eliminat[ing]
. . . kickbacks or referral fees that tend to increase un-
necessarily the costs of certain settlement services,"
§2601(b)(2). Section 2607(a) provides:

> "No person shall give and no person shall accept
> any fee, kickback, or thing of value pursuant to any
> agreement or understanding, oral or otherwise, that
> business incident to or a part of a real estate settle-
> ment service involving a federally related mortgage
> loan shall be referred to any person."

The neighboring provision, subsection (b), adds the
following:

> "No person shall give and no person shall accept
> any portion, split, or percentage of any charge made
> or received for the rendering of a real estate settle-
> ment service in connection with a transaction involv-
> ing a federally related mortgage loan other than for
> services actually performed."

These substantive provisions are enforceable through, *in-
ter alia,* actions for damages brought by consumers of
settlement services against "[a]ny person or persons who
violate the prohibitions or limitations" of §2607, with
recovery set at an amount equal to three times the charge
paid by the plaintiff for the settlement service at issue.
§2607(d)(2).

  Petitioners in this case are three married couples who
obtained mortgage loans from respondent Quicken Loans,
Inc. In 2008, they filed separate actions in Louisiana state
court, alleging, as pertinent here, that respondent had

---

[2] The statutory definition of "federally related mortgage loan" is set
forth in §2602(1).

violated §2607(b) by charging them fees for which no services were provided. In particular, the Freemans and the Bennetts allege that they were charged loan discount fees of $980 and $1,100, respectively, but that respondent did not give them lower interest rates in return. The Smiths' allegations focus on a $575 loan "processing fee" and a "loan origination" fee of more than $5,100.[3]

Respondent removed petitioners' lawsuits to federal court, where the cases were consolidated. Respondent thereafter moved for summary judgment on the ground that petitioners' claims are not cognizable under §2607(b) because the allegedly unearned fees were not split with another party. The District Court agreed; and because petitioners did not allege any splitting of fees it granted summary judgment in favor of respondent.

A divided panel of the United States Court of Appeals for the Fifth Circuit affirmed. 626 F. 3d 799 (2010). We granted certiorari. 565 U. S. ___ (2011).

II

The question in this case pertains to the scope of §2607(b), which as we have said provides that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." The dispute between the parties boils down to whether this provision prohibits the

_____

[3] Respondent maintains that at least the "loan origination" fee charged to the Smiths was in fact a mislabeled loan discount fee, like the allegedly unearned fees charged to the Freemans and the Bennetts. Respondent contends that loan discount fees fall outside the scope of §2607(b) because they are not fees for settlement services, but rather, as the Eleventh Circuit has held, are part of the pricing of a loan. See *Wooten* v. *Quicken Loans, Inc.*, 626 F. 3d 1187 (2010). Petitioners dispute this point on the merits and further argue that respondent forfeited the contention in the lower courts. We express no view on this issue.

collection of an unearned charge by a single settlement-
service provider—what we might call an undivided un-
earned fee—or whether it covers only transactions in
which a provider shares a part of a settlement-service
charge with one or more other persons who did nothing to
earn that part.

Petitioners' argument that the former interpretation
should prevail finds support in a 2001 policy statement
issued by the Department of Housing and Urban Devel-
opment (HUD), the agency that was until recently author-
ized by Congress to "prescribe such rules and regulations"
and "to make such interpretations" as "may be necessary
to achieve the purposes of [RESPA]," §2617(a).[4]   That
policy statement says that §2607(b) "prohibit[s] any
person from giving or accepting any unearned fees, i.e.,
charges or payments for real estate settlement services
other than for goods or facilities provided or services per-
formed." 66 Fed. Reg. 53057 (2001). It "specifically inter-
prets [§2607(b)] as not being limited to situations where at
least two persons split or share an unearned fee." *Ibid.*
More broadly, the policy statement construes §2607(b) as
authority for regulation of the charges paid by consumers
for the provision of settlements. It says that "a settlement
service provider may not mark-up the cost of another
provider's services without providing additional settle-
ment services; such payment must be for services that are
actual, necessary and distinct." *Id.,* at 53059. Moreover,
in addition to facing liability when it collects a fee that is

––––––––––

   [4] On July 21, 2011, HUD's consumer-protection functions under the
RESPA were transferred to the Bureau of Consumer Financial Protec-
tion.   See Dodd-Frank Wall Street Reform and Consumer Protection
Act, §§1061(b)(7) and (d), 1062, 1098, 1100H, 124 Stat. 2038, 2039–
2040, 2103–2104, 2113.  That day, the Bureau issued a notice stating
that it would enforce HUD's RESPA regulations and that, pending
further Bureau action, it would apply HUD's previously issued official
policy statements regarding RESPA.  76 Fed. Reg. 43570–43571.

entirely unearned, a provider may also "be liable under [§2607(b)] when it charges a fee that exceeds the reasonable value of goods, facilities, or services provided," *ibid.*, on the theory that the excess over reasonable value constitutes a "portion" of the charge "other than for services actually performed," §2607(b).

The last mentioned point, however, is manifestly inconsistent with the statute HUD purported to construe. When Congress enacted RESPA in 1974, it included a directive that HUD make a report to Congress within five years regarding the need for further legislation in the area. See §2612(a) (1976 ed.). Among the topics required to be included in the report were "recommendations on whether Federal regulation of the charges for real estate settlement services in federally related mortgage transactions is necessary and desirable," and, if so, recommendations with regard to what reforms should be adopted. §2612(b)(2). The directive for recommendations regarding the desirability of price regulation would make no sense if Congress had already resolved the issue—if §2607(b) already carried with it authority for HUD to proscribe the collection of unreasonably high fees for settlement services, *i.e.,* to engage in price regulation.

No doubt recognizing as much, petitioners do not fully adopt HUD's construction of §2607(b). Noting that even those Courts of Appeals which have found §2607(b) not to be limited to fee-splitting situations have held that the statute does not reach unreasonably high fees, see *Kruse* v. *Wells Fargo Home Mortgage, Inc.*, 383 F. 3d 49, 56 (CA2 2004); *Santiago* v. *GMAC Mortgage Group, Inc.*, 417 F. 3d 384, 387 (CA3 2005); *Friedman* v. *Market Street Mortgage Corp.*, 520 F. 3d 1289, 1297 (CA11 2008), petitioners acknowledge that the statute does not cover overcharges. They nonetheless embrace HUD's construction of §2607(b) insofar as it holds that a provider violates the statute by retaining a fee after providing no services at all in return.

In short, petitioners contend that, by allegedly charging each of them an unearned fee, respondent "accept[ed]" a "portion, split, or percentage" of a settlement, service charge (*i.e.,* 100 percent of the charge) "other than for services actually performed." §2607(b) (2006 ed.).

The parties vigorously dispute whether the position set forth in HUD's 2001 policy statement should be accorded deference under the framework announced by this Court in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). We need not resolve that dispute—or address whether, if *Chevron* deference would otherwise apply, it is eliminated by the policy statement's palpable overreach with regard to price controls. For we conclude that even the more limited position espoused by the policy statement and urged by petitioners "goes beyond the meaning that the statute can bear," *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 229 (1994). In our view, §2607(b) unambiguously covers only a settlement-service provider's splitting of a fee with one or more other persons; it cannot be understood to reach a single provider's retention of an unearned fee.[5]

By providing that no person "shall give" or "shall accept" a "portion, split, or percentage" of a "charge" that has been "made or received," "other than for services actually performed," §2607(b) clearly describes two distinct exchanges. First, a "charge" is "made" to or "received" from a consumer by a settlement-service provider. That provider then "give[s]," and another person "accept[s]," a "portion, split, or percentage" of the charge. Congress's use of different sets of verbs, with distinct tenses, to distinguish between

———————

[5] Petitioners also contend that the position set forth in the 2001 policy statement is consistent with a HUD regulation, 24 CFR §3500.14(c) (2011), and with prior administrative guidance. In light of our conclusion that §2607(b) unambiguously forecloses petitioners' position, we have no need to address this issue.

the consumer-provider transaction (the "charge" that is "made or received") and the fee-sharing transaction (the "portion, split, or percentage" that is "give[n]" or "accept[ed]") would be pointless if, as petitioners contend, the two transactions could be collapsed into one.

Petitioners try to merge the two stages by arguing that a settlement-service provider can "make" a charge (stage one) and then "accept" (stage two) the portion of the charge consisting of 100 percent. See Reply Brief for Petitioners 6. But then is not the provider also "receiv[ing]" the charge at the same time he is "accept[ing]" the portion of it? And who "give[s]" the portion of the charge consisting of 100 percent? The same provider who "accept[s]" it? This reading does not avoid collapsing the sequential relationship of the two stages, and it would simply destroy the tandem character of activities that the text envisions at stage two (*i.e.,* a giving and accepting).

Petitioners seek to avoid this consequence, at stage two at least, by saying that the *consumer* is the person who "give[s]" a "portion, split, or percentage" of the charge to the provider who "accept[s]" it. See Brief for Petitioners 21; Reply Brief for Petitioners 5. But since under this statute it is (so to speak) as accursed to give as to receive, this would make lawbreakers of consumers—the very class for whose benefit §2607(b) was enacted, see §2601. It is no answer to say that a consumer would not face damages liability because a violator is liable only "to the person or persons charged for the settlement service," §2607(d)(2), and it would not make sense to render a consumer liable to himself. It is the *logical consequence* that a consumer would be liable to himself, not the specter of actual damages liability, which provides strong indication that something in petitioners' interpretation is amiss.

At any rate, §2607(b) is also enforceable through criminal prosecutions, §2607(d)(1), and actions for injunctive relief brought by federal and state regulators, §2607(d)(4).

HUD's 2001 policy statement asserts that "HUD is, of course, unlikely to direct any enforcement actions against consumers for the payment of unearned fees," 66 Fed. Reg. 53059, n. 6, but that assurance is cold comfort. Moreover, even assuming (as seems realistic) that the Justice Department would be similarly reluctant to prosecute consumers for criminal violations of §2607(b), "prosecutorial discretion is not a reason for courts to give improbable breadth to criminal statutes." *Abuelhawa* v. *United States*, 556 U. S. 816, 823, n. 3 (2009).

Nor is the problem of consumer criminal liability solved by petitioners' suggestion that an unstated *mens rea* requirement be read into the criminal enforcement provision, §2607(d)(1), see, *e.g., Staples* v. *United States*, 511 U. S. 600, 605 (1994). If that would excuse only those consumers who are unaware that they are paying for unearned services, some consumers would remain criminally liable—those who know that the fee is unearned but decide to pay it anyway, perhaps because the provider's proposal is still the best deal. And if it would immunize *all* consumers, the statute's criminalization of the entire "giving" portion of consumer-provider transactions would make little sense. We find it virtually unthinkable that Congress would leave it to imputed *mens rea* to preserve from criminal liability some or all of the class RESPA was designed to protect—and entirely unthinkable that Congress would have created that strange disposition through language as obscure as that relied upon here.

The phrase "portion, split, or percentage" reinforces the conclusion that §2607(b) does not cover a situation in which a settlement-service provider retains the entirety of a fee received from a consumer. It is certainly true that "portion" or "percentage" *can* be used to include the entirety, or 100 percent. See, *e.g.,* 18 U. S. C. §648 ("portion"); 5 U. S. C. §8348(g) (2006 ed., Supp. IV) ("percentag[e]"); 5 U. S. C. §8351(b)(2)(B) (2006 ed.) (same); 12 U. S. C.

§1467a(m)(7)(B)(ii)(II) (same). But that is not the normal meaning of "portion" when one speaks of "giv[ing]" or "accept[ing]" a portion of the whole, as dictionary definitions uniformly show.[6] Aesop's fable would be just as wryly humorous if the lion's claim to the entirety of the kill he hunted in partnership with less ferocious animals had been translated into English as the "lion's portion" instead of the lion's share. As for "percentage," that word *can* include 100 percent—or even 300 percent—when it refers to merely a ratable measure ("unemployment claims were up 300 percent").[7] But, like "portion," it normally means less than all when referring to a "percentage" of a specific whole ("he demanded a percentage of the profits").[8] And it is normal usage that, in the absence of contrary indication, governs our interpretation of texts. *Crawford* v. *Metropolitan Government of Nashville and Davidson Cty.*, 555 U. S. 271, 276 (2009); *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995).

————————

[6] See, *e.g.,* Webster's New International Dictionary 1924 (2d ed. 1954) (hereinafter Webster's) (defs. 1, 4: defining "portion" as "[a]n allotted part; a share; a parcel; a division in a distribution[;] . . . [a] part of a whole"); 12 Oxford English Dictionary 154–155 (2d ed. 1989) (hereinafter OED) (defs. 1a, 5: defining "portion" as "[t]he part (of anything) allotted or belonging to one person; a share[;] . . . [a] part of any whole"); American Heritage Dictionary 1373 (5th ed. 2011) (def. 1: defining "portion" as "[a] section or quantity within a larger thing; a part of a whole").

[7] See, *e.g.,* Webster's 1815 (def. 1: defining "percentage" as "[a] certain rate per cent"); 11 OED 521 (def. a: defining "percentage" as "[a] rate or proportion per cent").

[8] See, *e.g.,* Webster's 1815 (def. 1: defining "percentage" as "a part or proportion of a whole expressed as so much or many per hundred"); 11 OED 521 (def. a: defining "percentage" as "a quantity or amount reckoned as so much in the hundred, i.e. as so many hundredth parts of another, esp. of the whole of which it is a part; hence *loosely*, a part or portion considered in its quantitative relation to the whole"); American Heritage Dictionary, *supra,* at 1307 (def. 2: defining "percentage" as "[a] proportion or share in relation to a whole; a part").

In the present statute, that meaning is confirmed by the "commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States* v. *Williams*, 553 U. S. 285, 294 (2008). For "portion" and "percentage" do not stand in isolation, but are part of a phrase in which they are joined together by the intervening word "split"—which, as petitioners acknowledge, Brief for Petitioners 19, cannot possibly mean the entirety. We think it clear that, in employing the phrase "portion, split, or percentage," Congress sought to invoke the words' common "core of meaning," *Graham County Soil and Water Conservation Dist.* v. *United States ex rel. Wilson*, 559 U. S. ___, ___, n. 7 (2010) (slip op., at 7, n. 7), which is to say, a part of a whole. That is so even though the phrase is preceded by "any"—a word that, we have observed, has an "'expansive meaning,'" *Department of Housing and Urban Development* v. *Rucker*, 535 U. S. 125, 131 (2002). Expansive, yes; transformative, no. It can broaden to the maximum, but never change in the least, the clear meaning of the phrase selected by Congress here.

Contrary to petitioners' contention, the natural connotation of "portion, split, or percentage" is not undermined in this context by our "general 'reluctan[ce] to treat statutory terms as surplusage.'" *Board of Trustees of Leland Stanford Junior Univ.* v. *Roche Molecular Systems, Inc.*, 563 U. S. ___, ___ (2011) (slip op., at 9) (quoting *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001)). Petitioners rightly point out that under our interpretation "portion," "split," and "percentage" all mean the same thing—a perhaps regrettable but not uncommon sort of lawyerly iteration ("give, grant, bargain, sell, and convey"). But the canon against surplusage merely favors that interpretation which *avoids* surplusage, see *Microsoft Corp.* v. *i4i Ltd. Partnership*, 564 U. S. ___, ___–___ (2011) (slip op., at 12–13)—and petitioners' interpretation no more achieves that

end than ours does. It is impossible to imagine a "portion" (even a portion consisting of the entirety) or a "split" that is not also a "percentage."

Petitioners invoke the presumption against surplusage a second time, urging that if §2607(b) is not construed to reach undivided unearned fees, it would be rendered "largely surplusage" in light of §2607(a)'s express prohibition of kickbacks. Brief for Petitioners 24. Not so. Section 2607(a) prohibits giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding . . . that business incident to or a part of a real estate settlement service . . . shall be referred to any person." §2607(a). That prohibition is at once broader than §2607(b)'s (because it applies to the transfer of any "thing of value," rather than to the dividing of a "charge" paid by a consumer) and narrower (because it requires an "agreement or understanding" to refer business). Thus, a settlement-service provider who agrees to exchange valuable tickets to a sporting event in return for a referral of business would violate §2607(a), but not §2607(b). So too a provider who agrees to pay a monetary referral fee that is not tied in any respect to a charge paid by a particular consumer—for instance, a "retainer" agreement pursuant to which the provider pays a monthly lump sum in exchange for the recipient's agreement to refer any business that comes his way. By contrast, a settlement-service provider who gives a portion of a charge to another person who has not rendered any services in return would violate §2607(b), even if an express referral arrangement does not exist or cannot be shown. In short, each subsection reaches conduct that the other does not; there is no need to adopt petitioners' improbable reading of §2607(b) to avoid rendering any portion of §2607 superfluous.

It follows that petitioners can derive no support from §2607's caption: "Prohibition against kickbacks and unearned fees." Subsection (a) prohibits certain kickbacks

(those agreed to in exchange for referrals) and subsection (b) prohibits certain unearned fees (those paid from a part of the charge to the customer).[9]

Petitioners also appeal to statutory purpose, arguing that a prohibition against the charging of undivided unearned fees would fit comfortably with RESPA's stated goal of "insur[ing] that consumers . . . are protected from unnecessarily high settlement charges caused by certain abusive practices," §2601(a). It bears noting that RESPA's declaration of purpose is by its terms limited to "*certain* abusive practices"—making the statute an even worse candidate than most for the expansion of limited text by the positing of an unlimited purpose. RESPA's particular language ultimately serves to drive home a broader point: "[N]o legislation pursues its purposes at all costs," *Rodriguez* v. *United States*, 480 U. S. 522, 525–526 (1987) *(per curiam)*, and "[e]very statute purposes, not only to achieve certain ends, but also to achieve them by particular means," *Director, Office of Workers' Compensation Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 136 (1995). Vague notions of statutory purpose

---

[9] The United States, as *amicus curiae*, raises an additional argument from the statutory context: that coverage of undivided unearned fees in §2607(b) can be inferred from the text of §2607(d), which sets out penalties for the "*person* or persons" who violate §2607(a) or §2607(b). §2607(d)(1), (2), and (3) (emphasis added). But Congress's use of the singular "person" does not remotely establish that §2607(b) can be violated by a single culpable actor who accepts an unearned charge from a consumer. In fact, any such inference is negated by the history of §2607. When RESPA was first enacted, §2607(d) separately provided for damages liability of "any person or persons who violate the provisions of subsection (a)" and of "any person or persons who violate the provisions of subsection (b)." §2607(d)(2) (1976 ed.). Because §2607(a), with its reference to an "agreement or understanding," has always required two culpable parties for a violation, Congress's use of the phrase "any person or persons" in connection with that subsection demonstrates that the phrase does not have the significance attributed to it by the United States.

provide no warrant for expanding §2607(b)'s prohibition beyond the field to which it is unambiguously limited: the splitting of fees paid for settlement services.

Nor is there any merit to petitioners' related contention that §2607(b) should not be given its natural meaning because doing so leads to the allegedly absurd result of permitting a provider to charge and keep the entirety of a $1,000 unearned fee, while imposing liability if the provider shares even a nickel of a $10 charge with someone else. That result does not strike us as particularly anomalous. Congress may well have concluded that existing remedies, such as state-law fraud actions, were sufficient to deal with the problem of entirely fictitious fees, whereas legislative action was required to deal with the problems posed by kickbacks and fee splitting.

In any event, petitioners' reading of the statute leads to an "absurdity" of its own: Because §2607(b) manifestly cannot be understood to prohibit unreasonably high fees, see *supra,* at 5, a service provider could avoid liability by providing just a dollar's worth of services in exchange for the $1,000 fee. Acknowledging that §2607(b)'s coverage is limited to fee-splitting transactions at least has the virtue of making it a coherent response to that particular problem, rather than an incoherent response to the broader problem of unreasonably high fees.

\*    \*    \*

In order to establish a violation of §2607(b), a plaintiff must demonstrate that a charge for settlement services was divided between two or more persons. Because petitioners do not contend that respondent split the challenged charges with anyone else, summary judgment was properly granted in favor of respondent. We therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*